*S. C. Stevens*, for the plaintiff.

_____    ƒ

BAKER *v.* LEATHERS and Others.

Where the material facts alleged in a bill are admitted by the answer, but distinct facts are set up in avoidance, the burthen of proof is upon the defendant.

If a father purchases land with his own money, and by way of advancement to his daughter takes the deed in her husband's name, no resulting trust arises in favor of the father.

If the father afterward purchases the land of the son-in-law, the advancement to the daughter cannot be deducted from the purchase-money.

A resulting trust may be established by the parol declarations of the person to whom the conveyance is made.

Such evidence is, however, most unsatisfactory, on account of the facility with which it may be fabricated, the impossibility of contradiction, and the consequences which the slightest mistake or failure of memory may produce; yet if it is plain, consistent, and, especially, if corroborated by circumstances, it is competent ground for a decree.

The Supreme Court will weigh the evidence in a suit in chancery where it is conflicting.

APPEAL from the *Kosciusko* Circuit Court.

STUART, J.—This was a bill in chancery by *Jacob S. Baker* against the heirs of *Jacob Leathers*, deceased.

The bill and the several amendments state that *Baker* owned a tract of land in *Kosciusko* county, part of which he sold to *Jacob Leathers*, deceased, for 1,130 dollars, to be paid in cash, or secured by the promissory notes of *Leathers* so soon as the latter returned to his home in *Ohio*. At the time of the sale, *Leathers* was on a visit to the complainant, who was his son-in-law. After the return

of *Jacob Leathers* to *Ohio*, his son, *Silas Leathers*, one of the defendants, visited *Baker*, and, on the eve of his return, *Baker* and wife executed a deed to *Jacob Leathers* for the land so sold, being the same land particularly described in the bill. The bill alleges that the utmost confidence and good understanding subsisted between *Baker* and his said brother-in-law, *Silas Leathers*. He accordingly placed the deed in the hands of *Silas*, to be delivered to said *Jacob Leathers*, the father, when the latter should have executed his notes to *Baker* for the purchase-money; expressly charging in the bill that the deed was delivered as an *escrow*. The bill avers that *Jacob Leathers* never returned to *Indiana;* never gave his notes; never paid the purchase-money; that he died shortly after, leaving the defendants his heirs at law, and said *Silas* his executor; and that they have failed and refused to pay the purchase-money. It is further charged that, shortly after the delivery of the deed to *Silas*, instead of taking it to *Ohio* as directed, he secretly had it recorded, contrary to the said instructions, and without the knowledge of the complainant. In one of the several amendments to the bill *Baker* admits the receipt of 500 dollars of the purchase-money. The bill makes the heirs of *Jacob Leathers*, deceased, defendants, requires them to answer under oath, and prays for special and general relief.

*Silas Leathers* answers, substantially admitting the purchase, but alleging payment of the purchase-money before the execution of the deed. He denies that the deed was delivered as an *escrow*, but, on the contrary, insists that it was delivered to him for his father. He also denies that the deed was recorded contrary to the instructions or wishes of *Baker*.

Several of the other defendants file answers; but they put the defense on entirely different ground from that taken by *Silas*. The answer of *John Leathers* is to this effect. He assumes that in the original purchase of the land by complainant from *Scoles*, *Baker* was the mere agent of *Jacob Leathers*, senior; that *Baker* had fraudulently taken the deed in his own name; thus holding it in

trust for said *Leathers*, senior. He further alleges that the price was 1,000 dollars; that the money was paid by his father in *May,* 1840; and that the deed of *Baker* to *Leathers*, senior, was not delivered as an *escrow*. Yet, in a subsequent part of his answer, he avers that he himself paid *Baker*, for his father, on account of the purchase of the land, the sum of 880 dollars.

The answers of *Mary Ann*, *Jacob*, and *William Leathers* take the same position as that assumed in *John's* answer, and very nearly in the same words. Even *Silas* files a second answer, in which he follows *John* with remarkable precision. The circumstance, that all the answers are virtually copies of *John's* answers, that there is not merely a general resemblance, but a sameness even to the very paragraphs and phraseology, is a singular one. It is seldom that different persons think the same thoughts, in the same order, and clothe them in the same language.

It is admitted by all the answers that *Silas* never delivered the deed to his father; though over two years intervened between the recording of the deed and his father's death.

There was no demurrer to the bill or amendments; no exceptions to the answers; and in this Court no authorities have been cited by either party. On final hearing the Court dismissed the bill at complainant's costs. *Baker* appeals.

The depositions are very voluminous. An abstract of them, brief and unsatisfactory as it must be, would answer no good purpose, and would swell the opinion far beyond the relative importance of the questions involved.

Had the test of demurrers and exceptions been applied to the pleadings in the Court below, it would have narrowed and pointed the issues, and greatly facilitated the labors of this Court. Without such tests, it is no easy matter to deduce from the bill, amendments, and answers the precise state of facts assumed and relied upon by the respective parties.

From these pleadings the only issue to be gleaned, which is material, is this: Did *Leathers*, senior, pay or advance any money, and if so, for what purpose?

The purchase of the land by *Baker* from *Scoles*, and the deed for a part of this land by *Baker* to *Leathers*, senior, are not disputed. *Baker* alleges that the consideration of that deed was 1,130 dollars, and that *Leathers* has never paid it. The heirs answer he did pay it in this way—he advanced to *Baker*, as his (*Leathers's*) agent, the money to buy the land from *Scoles*—*Baker* fraudulently took the deed in his own name; and his deed of *November* 16, 1840, to *Leathers*, senior, was made in consideration of the previous payment and to purge the previous fraud.

By the issue thus tendered the burden of proof devolved on the defendants. 6 Blackf. 542.—7 Blackf. 162. If the depositions on the part of the defense sustain that issue, the Court below was correct in dismissing the bill.

As has been observed, the evidence on both sides takes a very wide range. We have examined and weighed it with great care. It is clearly proved that *Leathers*, senior, advanced money to *Baker*, but not for the purpose alleged in the answers. The evidence is, that in the year 1839, *Baker* bought a tract of land from *Scoles* for 1,400 dollars, paid 10 dollars, and entered into a sealed agreement specifying the terms of purchase; that, at the time, in the presence of *Silas*, one of the defendants, *Baker*, on inquiry made, told how he expected to pay for it, viz., by the proceeds of lands he had lately sold, and if he needed more he expected to get it from *Leathers*, senior, his father-in-law, as an advancement to his wife. *Silas Leathers* replied, his "father had promised to do so." In *May*, 1840, *Baker* paid part of the money, gave his note for part, and *Leathers*, senior, paid the balance, distinctly putting it upon the ground of an advancement to *Margaret Baker*, wife of the complainant.

It will not be contended that money thus advanced, supported by the consideration of natural love and affection, can be resumed at pleasure, or recovered by the donor or his heirs either at law or in equity. Yet that is the claim

set up in this defense.   The father advances his daughter by paying for land, and takes the deed, if you please, in the name of her husband.   He subsequently purchases part of the land from his son-in-law, and, after his death, his heirs seek to make the prior advancement meet the consideration expressed in the deed.   In other words, they wish to resume the donation, to recover back the advancement.   The deed from *Scoles* to *Baker* for the entire tract of land was executed and delivered to him in the presence of *Leathers*, senior, and of *John Leathers*, one of the defendants.   In the language of the witnesses, there was no intimation from any quarter, that the land belonged to any other person than *Jacob S. Baker*.   *Leathers*, senior, spoke of the part he paid as a " legacy or gift" to his daughter. These facts repel the allegation in the several answers, that *Baker* fraudulently took the deed in his own name. Under such circumstances there could be no resulting trust to *Leathers*, senior.   6 Blackf. 193.—10 Paige, 618.— 9 Dana, 84.

This view of the case is abundantly sustained by the depositions of *Baker*, senior, of *George Scoles*, and above all, of *John Scoles*, who sold the land to *Baker*.   They were all present at the making of the contract between *Scoles* and *Baker* in 1839; and again at its consummation in *May*, 1840, when the money was paid and the deed delivered.   They speak of the transaction as a whole. They speak of *Baker's* expectation of aid from his father-in-law, openly expressed at the time of the purchase in 1839.   On that occasion *Silas*, one of the defendants, at another time *John*, also a defendant, announced that their father intended to furnish such aid.   The father himself frequently expressed his intention of doing something for *Baker*, making a " gift or legacy" to his daughter, Mrs. *Baker*, &c.   He made that " gift" by paying part on *Baker's* land, so designating the payment at the time, and accordingly by his acts directing the deed to be made to *Baker*.   If he afterwards bought land from *Baker*, what reason is there why he or his heirs should not pay like any other purchaser?   This view of the case is entirely

consistent with the allegations of the bill, and utterly in-
consistent with the matter in avoidance set up in the an-
swers.

It is readily admitted that a resulting trust may be
established upon the parol declarations of the person in
whose name the conveyance is taken; but "such evi-
dence is most unsatisfactory, on account of the facility
with which it may be fabricated, the impossibility of con-
tradiction, and the consequences which the slightest mis-
take or failure of memory may produce. Yet if plain,
consistent, and, especially, if corroborated by circum-
stances, it is competent ground for a decree." 2 J. C. R.
405.—1 Wendell, 626. The evidence for the defendants
does not bring them within this rule. It is not to be de-
nied, however, that the testimony deduced from the two
sets of depositions cannot be reconciled. In such cases
it is our duty to weigh the evidence. We have done so.
The result is that the preponderance is strongly in favor
of the complainant. Against the array of facts disclosed
in the depositions of *Baker* and *G.* and *J. Scoles*, fortified
as they are by the depositions of other witnesses—facts,
too, which explain in natural and clear connection the
whole history of the transaction in entire accordance
with the face of the title papers—against such evidence
the "impressions" and "understandings" of witnesses
from loose conversations imperfectly understood as such
things must be, and contradicting the face of contempo-
raneous title papers as these do, are not entitled to much
weight. Indeed, we have not attached much importance
to the numerous conversations, several years old, collect-
ed against each other by the respective parties. There
is a clear, unvarying language in the facts which careless
admissions conveyed to us through the dull ear and im-
perfect memory of witnesses cannot bepermitted to con-
trol.

From a careful review of the whole case we think the
Court erred in dismissing the bill. The decree should
have been for the purchase-money with interest. The
evidence shows that the price agreed upon was 1,000 dol-

lars, and the assumption by *Leathers*, senior, of the payment of *Baker's* note to *Scoles* of 120 dollars, which it is proved *Baker* himself afterwards paid, making the whole consideration 1,120 dollars, with interest, from *November* 16, 1840, deducting the 500 dollars admitted by *Baker* to have been paid. As there is nothing in the evidence to show that *Leathers* had ever paid any money on the purchase from *Baker*, but only that he had advanced money to his daughter, Mrs. *Baker*, long prior to that purchase, it would seem that *Baker's* admission of 500 dollars relates to that advancement. But as he has admitted the payment, without explanation, he is bound by it; and as there is no date specified, and no evidence of such payment after *November* 16, 1840, we must presume that it was paid on or before that day. So that the decree will be for the residue, namely, 620 dollars, with interest from *November* 16, 1840, the date of the deed.

*Per Curiam.*—The decree is reversed. Cause remanded, with instructions to the Circuit Court to enter a decree for the complainant as above indicated, declaring it a lien on the land described in the bill, giving the defendants thirty days to pay the amount of the decree, with costs, and in default thereof that execution issue to sell the land, &c.

*T. G. Harris*, for the appellant.

*J. B. Niles*, *A. L. Osborn*, and *D. D. Pratt*, for the appellees.