DAVID WORCESTER *versus* JOHN M. LORD.

To constitute a disseizin, the possession of the disseizor must be adverse in its character, importing a denial of the true owner's title in the specific parcel of land claimed.

The intention of the disseizor need not necessarily, in all cases, be to wrongfully possess himself of property known to him to belong to another.

It was not the intention of R. S., c. 105, § 10, to make the "possession, occupation and improvement," therein described, conclusive evidence of disseizin and a bar to "the right of the true owner."

The object of this section was to make such possession and occupancy "sufficient" evidence of the adverse intent of the party holding it, in the absence of other testimony establishing its true nature.

What testimony will overcome such sufficient evidence, and establish the true character of the possession.

ON REPORT.

WRIT OF ENTRY.

The case is stated in the opinion.

*W. H. McCrillis*, for the defendant, elaborately argued the following propositions : —

1. Notorious, exclusive and hostile occupation of land, without right, is not an ouster of the owner, nor a disseizin. To constitute an ouster or a disseizin, there must be notice to the owner.

2. Such occupation, continued for twenty years, is constructive notice to the owner during the whole time, bars the original owner's right of entry or action, and the tenant holding such possession gains the title by disseizin.

3. Notice is not presumed from an occupation short of twenty years. And the deed of the owner would convey the title without the statute of 1841.

4. In *Brown* v. *Gay*, 3 Maine, 126, the occupation of the tenant was less than twenty years, and the owner had no actual notice of the occupation. Hence demandant's grantor was not disseized at the time of his deed to the demandant and no impediment to its operation.

5. It is immaterial whether such occupation be with the belief, through mistake, that it is with right, or with knowledge that it is without right.

6. R. S., c. 105, § 10, was enacted immediately after the separation of Maine from Massachusetts. The law of Massachusetts was that, to constitute adverse possession, an enclosure was necessary. Such a doctrine was not in accordance with the decisions of the Federal Courts, nor founded on principle, nor adapted to the sparsely settled condition of this State. *Ellicott* v. *Pearl*, 10 Peters, 412; *Erving* v. *Burnett*, 11 Peters, 41; 2 Smith's Leading Cases, 472. The object of the statute was to remedy this mischief. *Prop'rs Ken. Purchase* v. *Laboree*, 2 Maine, 275.

It is not to be presumed that the Legislature intended to make any innovation upon the common law further than the necessity of the case required. The statute introduces the new rule that the land need not be enclosed. It affirms the other principles of the common law.

*A. W. Paine*, for the plaintiff.

BARROWS, J. — Writ of entry; case submitted, without the intervention of a jury, to the presiding Judge who reports the facts found by him to this Court for decision. The prominent and essential facts found are as follows: — The tenant is the owner, under a valid record title, of lot. No. 110, according to a certain survey; and the demandant, under like title, is the owner of the adjoining lot No. 39, according to same survey. According to the true original line between these lots, as found by the presiding Judge, all the land de-

manded in this suit is part and parcel of lot No. 110, except a small piece, about 17 links in width at the widest part, indicated upon the plan made by the surveyor in the case, which piece is part of demandant's lot (No. 39,) and which he is "entitled to recover, unless barred or limited by a disseizin by tenant continued for more than 20 years." In 1837, lot 39 was conveyed by the owner, Benjamin Bussey of Roxbury, Mass., to Wm. Lowder of Bangor, who went into immediate possession, mortgaging the lot back to Bussey to secure the purchase money. In 1839, more than 20 years before the commencement of this suit, while Lowder was in possession of No. 39, the tenant built a fence which he intended as a line fence between the lots, and intended to build it on the true line, and built it in fact upon that line the greater part of the distance, but by a mistake, not discovered till since the commencement of this suit, excluded in one place part of his own lot No. 110, and included in another this small parcel of lot 39. At the point where this occurred, and for a considerable distance beyond it and up to the line of an adjoining lot, the fence was a brush or lop fence made by felling trees on or near the line, such as is usual to keep out cattle. The land here was woodland and occupied as part of tenant's farm as a wood lot, and the whole fence has been kept up substantially in the same place since it was first erected. Wm. Lowder, the mortgager of No. 39, knew of the building and continuance of this fence while he was in possession, but there is no evidence that Bussey or Samuel Lowder, his agent in Bangor, had knowledge of it. Before 1843, Wm. Lowder's equity was foreclosed, and in that year Bussey's Executors sold No. 39 to one Stone of Newburyport, who, in 1855, conveyed it to demandant. Stone and the demandant, at and after the dates of their respective purchases, had knowledge of the existence of the fence, and they and Wm. Lowder severally and respectively, during their possession of lot 39, knew of tenant's occupancy up to said fence, supposing it to be on the true line, From about 1853 to 1855, the tenant, Lord, was

agent for Stone, having the general oversight of lot 39, paying the taxes on it, and being authorized to obtain a purchaser for it at a fixed price, he, (Lord,) to have for his own all that could be obtained over that sum; and did accordingly negotiate the sale to demandant, who insisted upon a warranty deed, which Stone, after some discussion in presence of the tenant, gave with his knowledge and assent, bounding the lot by the true line, all parties supposing that the fence was on that line for the whole distance; and tenant received $150 of the purchase money, being the amount over and above the price fixed by Stone upon the lot. Unless qualified or controlled (as to this small parcel of lot 39, thus included with 110) by the foregoing facts, the case finds that the tenant has been in the open, notorious, exclusive, adverse and continued possession, occupation and improvement of all the land included within his said fence for more than twenty years previous to the commencement of the suit, such possession and occupation comporting with the ordinary management of a farm by its owner.

Were those under whom the demandant claims disseized of this small parcel of their lot by the erection and maintenance of this fence under such circumstances? Was the possession of the tenant, rightly construed in the light of the foregoing facts, adverse?

The answers to these questions must determine the result. "Unless barred or limited by a disseizin by tenant, continued for more than 20 years," demandant is found entitled to recover this small strip.

Mr. Preston defines disseizin generally thus, — "It is an ouster of the rightful owner of the seizin. It is the commencement of a new title, producing that change by which the estate is taken from the rightful owner and placed in the wrongdoer. Immediately after a disseizin, the person by whom the disseizin is committed has the seizin or estate, and the person on whom this injury is committed has merely the right or title of entry."

We read this and do not seem to be much nearer a prac-

tical answer to our questions than before. What constitutes "ouster of the rightful owner?" It is a wrongful entry upon the property of another, accompanied by a removal of the owner from the possession. It is not every unlawful entry into lands that will work a disseizin. Such entry will never have that effect so long as the true owner still retains his possession, for, by intendment of law, when two persons are in possession at the same time, the seizin must be adjudged to be in the rightful owner. But neither is dispossession necessarily disseizin. Whether there is, or is not, actual disseizin must depend upon the character of the act done, and the intention of the doer. Many acts are justly held to operate a disseizin, or not, at the election of the true owner. To make a disseizin in fact, there must be an intention on the part of the party assuming possession to assert title in himself to the definite and particular parcel, or there must be "overt acts which leave no room to inquire about intention, and which amount to actual ouster in spite of the real owner."

Cruise says "a disseizin is where one enters intending to usurp the possession and to oust another of the freehold. Therefore, *quærendum est a judice quo animo* he entered." 1 Greenleaf's Cruise, page 51.

"Every disseizin is a trespass," says Chancellor KENT, "but every trespass is not a disseizin. A wrongful intention to oust the real owner must clearly appear in order to raise an act, which may be only a trespass, to the bad eminence of a disseizin." 4 Kent's Com., 486, (4th edition.)

To make a disseizin, that will, in the language of Preston, be "the commencement of a new title, producing that change by which the estate is taken from the rightful owner and placed in the wrongdoer," the possession taken by the disseizor must be hostile or adverse in its character, importing a denial of the owner's title in the property claimed, otherwise, however open, notorious, constant and long continued it may be, the owner's action will not be barred.

If in possession in submission to, and acknowledging the

title of the real owner, within twenty years before the commencement of the action, the tenant cannot make good a title by disseizin and continued possession.

In the case at bar, the description of the fence as a lop or slash fence, "made by felling trees on or near the line, such as is usual to keep out cattle," is not, of itself, decisive, because other facts are found which would, (unless controlled by still other matter in the case,) bring it within the provisions of our statute, (R. S., c. 105, § 10,) and bar the demandant's action.    The land where this fence was was woodland, used as a wood lot in connection with tenant's farm, and the possession of the tenant was such as to dispense with the necessity of any fence at that point, unless the tenant's possession is affected by the existence of some other fact indicating its true character.    But the manner of building the fence is not without weight in showing the origin and character of the tenant's possession of this small parcel of lot 39.    Swerving slightly from the true line, as the growth upon the lot made it convenient for the erection of such a fence, excluding a portion of his own lot here, and including this portion of the demandant's lot there, he has made a line differing from the record title under which he, as well as his adversary claims, and not to be sustained unless his possession has been such as to bar the demandant's action.

Doubtless his possession has been such that, uncontrolled by other facts appearing in the case, it would make good his present claim.    Such is the extent and meaning and limit of the effect of R. S., c. 105, § 10, before referred to.

It was never the intent or meaning of that section, or of the substantially similar provisions which preceded it, coeval with the organization of this State, (see Laws of 1821, c. 62, § 6, and R. S. of 1841, c. 147, § 11,) to make such possession and occupancy conclusive evidence of disseizin, and a bar to a demandant's right of action, when confronted with evidence establishing the fact that such possession and occupancy was in truth not actually hostile

or adverse in its character, or to do away the adversary element required to make a perfect title by possession. To hold otherwise, would be to relieve every tenant of twenty years standing from all obligation to his landlord, and preclude the lawful owner from asserting his rights to property which had been twenty years out of his possession, no matter what the agreement or understanding might have been in consequence of which he had suffered it to continue so. The object of these provisions was to make such possession and occupancy sufficient evidence of the adverse intent of the party holding it, in the absence of other testimony establishing its true nature.

All our decisions, in any way bearing upon the question here, whether as to the nature and essential elements of disseizin or of adverse possession, such as *Brown* v. *Gay*, 3 Greenl., 126, *Ross* v. *Gould*, 5 Greenl., 204, *Little* v. *Libby*, 2 Greenl., 242, *Dennett* v. *Crocker*, 8 Greenl., 239, *Otis* v. *Moulton*, 2 Appleton, 205, *Alden* v. *Gilmore*, 13 Maine, 178, *Lincoln* v. *Edgecomb*, 31 Maine, 345, *Eaton* v. *Jacobs*, 49 Maine, 559, were made under statute provisions substantially similar, and all are believed to be inconsistent with such a refining away of the adverse element necessary to constitute a disseizin and to bar by possession a demandant's right of action, as would enable us to sustain the tenant's position here.

He has been in the sole and continuous possession, occupation and improvement of the little strip for more than twenty years prior to the commencement of this action, and that possession and occupation have been open, notorious, and comporting with the ordinary management of a farm, and would be deemed exclusive and adverse so as to bar or limit the right of the true owner to recover it, if it did not also appear that throughout all the time, until the discovery of his present predicament, his claim of title has been according to the true line, that he intended to place his fence all the way upon that line, supposed he had done so, and did not discover his mistake until since the com-

mencement of this suit. The boundary of his land, of all in which he intended to claim title and the right of possession, was that line, laid down in the title deeds and ascertained by the Court. Hence, when, in 1855, the demandant before purchasing, claimed of Stone his immediate grantor, a warranty deed of lot 39, the tenant agreed that such a deed should be given, and, after discussion in his presence, Stone gave the deed, including with the lot the strip, which unknown to both parties was fenced in with the tenant's land, and not including that part of tenant's lot No. 110 which was by mistake separated from the rest by the fence. It is unnecessary to determine what effect, (if any,) by way of estoppel, the tenant's position as agent for Stone, or his act in negotiating this sale and receiving part of the purchase money, might have, because his assent to the making of such a conveyance, and the explicit findings (above recited) as to his intentions in regard to the fence, are conclusive as to the character of his possession, and establish the fact that it was not adverse, as might otherwise have been inferred from its being open, notorious, and comporting with the ordinary management of a farm; and there is no necessity for resorting to the doctrine of estoppel, even if the facts reported would raise one.

The controversy between these parties was not whether the line between their lots was a straight line or a crooked one. It was the point of departure and the course only which needed to be ascertained. There is no suggestion that the line has been varied by any agreement of parties, followed by an occupation under claim of right, or that the tenant's occupation originated or has been continued otherwise than by simple mistake. It is not a case where there is room to suppose that "papers may be lost, facts forgotten or witnesses dead." The tenant did not claim title to anything beyond his true line, until driven to do so by the discovery that the fence which he intended to place upon that line, and thought he had so placed throughout, was not entirely so. The character of his possession of the

little strip is clearly ascertained. The principal matter in dispute seems to have been settled in his favor at the trial.

What ought he to have done to protect himself against a liability for costs? Simply to have disclaimed seasonably so much of the demanded premises as lay westerly of the true line, and shown (as was shown in *Lincoln* v. *Edgecomb*, 31 Maine, 345,) that the fence was built on demandant's land by mistake, that he had not claimed to own beyond the true divisional line, nor actually prevented the demandant from occupying to that line. Not having done this, he must pay in costs the penalty of his mistaken assumption that the fence was actually located throughout upon the true line as he intended it should be, and supposed, until recently, it was, and of his present attempt to " raise what was only a trespass to the bad eminence of a disseizin."

Such a result alone seems conformable to the decisions of our own Court herein before referred to, and to the legal doctrine pertaining to disseizin and adverse possession herein stated.

The elaborate and ingenious argument of the tenant's counsel fails to convince us that the reason assigned by the Court for the decision in *Brown* v. *Gay*, *ubi sup.*, was erroneous, or that similar decisions of our own Court, which have followed it, should now be disregarded.

An involuntary trespass may occur, but an unintentional disseizin is an anomaly. Yet, in saying this, we are not to be understood as laying down the doctrine that, to constitute a disseizin, the intention of the disseizor must of necessity, in all cases, be wrongfully to possess himself of property known to him to belong to another. The *animus furandi*, (if that phrase could properly be applied to a wrongful appropriation of real estate,) or Ahab's wicked intention to seize as his own the vineyard of his neighbor, is not essential. Cases not unfrequently do arise where the disseizin is innocently committed under a mistake as to the validity of the title, but the title must be asserted. Cases may arise

where a man may be under a mistake as to the true extent of his domain, yet, if he intentionally claims title to all which he has in possession, his neighbors may be barred, by lapse of time, from asserting their rights.   The point is here, — a man claiming title only to a specified line, capable of being ascertained, cannot, by ignorantly having possession up to another line, acquire a title by disseizin to land lying between the two which he does not intentionally claim.

Upon this matter of a disseizin by occupancy through mistake, or misapprehension of the dividing line, the decisions in this State and those in Tennessee, (*Gates* v. *Butler*, 3 Humph., 447,) are said, by Mr. GREENLEAF, to differ from those in Connecticut, (*French* v. *Pearce*, 8 Conn., 440, 445, 446,) and in Pennsylvania, (*Jones* v. *Porter*, 3 Penn., 132.)   How substantial that difference might be found upon a careful examination to be, it is not necessary to the decision of this case to ascertain.

*Judgment for the demandant for the strip of land*
*lying within the tenant's fence, westerly of the true*
*original line between the lots as ascertained at the trial.*

WALTON, DICKERSON, DANFORTH and TAPLEY, JJ., concurred.