BUMP v. BUTLER COUNTY et al.

(Circuit Court, E. D. Missouri, E. D. March 15,·1899.)

No. 3,844.

1. JUDGMENT—COLLATERAL ATTACK—DEFECT OF PARTIES.·

A railroad company executed a mortgage by which it conveyed certain lands it had received from a county in payment of a stock subscription to three trustees, and "to the survivor and survivors, successor and successors, of them," as joint ·tenants, to secure the payment of bonds. The

mortgage further provided for the filling of vacancies in the office of trustee. The county subsequently brought a suit to cancel its conveyance of the lands to the company and the mortgage thereon, making the company and the original trustees defendants; service on the trustees being made by publication as nonresidents. Prior to the commencement of the action one of the trustees had died, and another died before the order for publication was returnable. Action was taken purporting to fill the vacancies so caused, but no record thereof was made in the county where the mortgage was recorded; nor did the pleadings, which were filed on behalf of all the defendants, suggest either the deaths of the original trustees or the new appointments, although one of the appointees appeared of record as counsel, and such facts were not known to the county or its counsel until after final decree, which was rendered three years after the suit was commenced, and which set aside and canceled the conveyance from the county and the mortgage, as to the lands in suit. *Held* that, conceding the regularity and validity of the appointment of the new trustees, it must be presumed, in support of the jurisdiction of the court, when collaterally attacked, that such appointments had not become effective by the acceptance of the appointees, and that the title under the mortgage remained in the survivor of the original trustees, and the decree was therefore a conclusive adjudication of the invalidity of the title of the company and its trustees.

2. CORPORATIONS—DISSOLUTION BY SALE OF PROPERTY—VALIDITY OF SERVICE.

Where a legislative act directing the sale of a railroad to satisfy a lien of the state especially provided that it should not be construed to authorize the conveyance to the purchaser of any lands which had been conveyed to the railroad by counties, of which the company held a large amount, the sale cannot be held to have worked a dissolution of the railroad corporation, so that a service upon its officers did not give a court jurisdiction over the company in a subsequent suit relating to such lands, especially where it appeared and contested the suit, and continued to exercise the powers of a corporation for years thereafter.

3. LACHES—ATTACKING VALIDITY OF DECREE.

A delay of nearly 30 years by a claimant of land out of possession, before bringing suit, constitutes such laches as will preclude him from attacking the validity of a decree which adjudged the title to be in the defendant county, and under which it and its grantees have claimed ever since.

4. ESTOPPEL—COLLECTION OF TAXES BY COUNTY.

Where a claimant of lands adversely to a county and its grantees, pending litigation as to his rights, and with knowledge that he did not have the legal title, voluntarily procured the land to be assessed in his name, and paid the taxes thereon for a number of years, the acceptance of such taxes will not estop the county, nor its grantee having knowledge of such facts, from asserting title to the lands.

5. ADVERSE POSSESSION—REQUISITES—WILD LANDS.

Acts of ownership exercised over wild and unoccupied lands, to constitute adverse possession as against the owner of the superior title, must be of a character so open, notorious, and unequivocal that they cannot fail to be known to the true owner, and to advise him of the claim made; and loose testimony as to occasional acts by a claimant, such as the making of surveys or driving off trespassers, while at the same time the owner of the legal title of record was exercising similar acts, and was offering for sale and selling portions of the lands, is insufficient to establish such adverse possession as will ripen into title, and in such case the rule must be applied that possession follows him who has the better title.

M. W. Huff and John F. Shepley, for complainant.
M. L. Clardy and Wood & Douglas, for defendants.

ADAMS, District Judge. This is a suit in equity to annul certain conveyances of swamp lands in Butler county, as clouds upon com-

plainant's title. The complainant claims title through the following legislative acts and conveyances: That is to say, the act of congress of September 28, 1850, authorizing the conveyance of certain lands, known as "swamp or overflowed lands," to the state of Missouri; the acts of the general assembly of the state of Missouri approved March 3, 1851, and February 23, 1853, donating to Butler county such of said swamp lands as were located within its confines; the act of the general assembly of Missouri of February 24, 1853, authorizing the formation of railroad associations, and subscriptions to the capital stock of such associations by counties; the orders of the county court of Butler county of dates October 24, 1854, and December 6, 1855, making two subscriptions, each for $50,000, to the capital stock of the Cairo & Fulton Railroad Company, and providing for the payment of such subscriptions by the conveyance to said railroad company of swamp lands at $1 per acre; the selection of such lands; the conveyance thereof to the railroad company by a patent executed by the governor of the state of Missouri, of date April 20, 1857; the mortgage executed by the railroad company, of date May 23, 1857, conveying said lands to Moore, Wilson, and Waterman, trustees, to secure the payment of an issue of 1,600 bonds of the railroad company, each for the sum of $1,000; the foreclosure of said mortgage by a decree of the supreme court of Missouri rendered on the —— day of ——, 1879, in the proceedings instituted by Charles P. Chouteau against the Cairo & Fulton Railroad Company et al.; the sale of the lands on October 30, 1882, by a deed executed by the special commissioner appointed by the supreme court of Missouri, to Charles P. Chouteau, from whom the complainant, by mesne conveyance, claims to have acquired title. The defendants admit complainant's chain of title as already set forth, but assail some of the proceedings involved in it, and especially the validity of the subscriptions made by the county court of Butler county to the stock of the railroad company. They contend that these subscriptions were without authority of law, in that there was no vote of the taxpayers of the county, as required by section 29 of the act of February 24, 1853, authorizing such subscriptions, and that the subsequent selection of lands, and conveyances thereof to the railroad company, and its mortgage thereof to secure its issue of bonds, were each and all illegal and void acts. The proof shows that a suit was instituted in the circuit court of Butler county on the 12th day of June, 1866, by Butler county against the Cairo & Fulton Railroad Company and Moore, Wilson, and Waterman, trustees named in the mortgage, to cancel and set aside the patent to the railroad company, and its mortgage of May 23, 1857, to Moore, Wilson, and Waterman, trustees, because of fraud and illegality in the proceedings involved in securing the same, and that such proceedings were had as resulted on the 2d day of July, 1869, in a final decree annulling said patent and mortgage, and vesting the title to the lands described in the mortgage in Butler county. The proof further shows that the county thereafter, by three separate conveyances called "patents," dated, respectively, January 31, 1871, and December 10 and December 21, 1874, conveyed a part of the lands included in said mortgage so annulled by the decree of 1869 to the defendant the St. Louis, Iron Mountain & Southern Rail-

way Company. (I do not now, and will not hereafter, undertake to distinguish between the two names of this corporation,—the railroad company and its successor, the railway company.) It is these convey ances, and others of like character, which the complainant seeks to have set aside as clouds upon his title.

As already stated, complainant claims a title of record from Butler county, by and through its subscriptions to the capital stock of the Cairo & Fulton Railroad Company, its conveyance of the lands in question to the last-named railroad company in payment of such sub scriptions, the mortgage by the last-named railroad company to secure its bonds, the foreclosure of the mortgage, and purchase thereunder by his grantor, Mr. Chouteau.

The foundation of complainant's title is assailed at the outset by the defendants. It is conceded in the argument of this case that the sub scriptions to the capital stock of the Cairo & Fulton Railroad Company were made by the county court of Butler county without the assent of the taxpayers of the county, secured at an election held for that purpose. It is contended that under the provisions of section 29 of the act of February 24, 1853, such a vote was a condition precedent to the right to make the subscriptions in question. On the other hand, the complainant contends that such is not the true construction of said section 29, and claims further that by the provisions of the act of December 10, 1855, entitled "An act to secure the completion of cer tain railroads in the state," the county court of Butler county had the right to subscribe its overflowed or swamp lands as stock to any rail road passing through the county, upon such terms, and to be valued at such prices, as may be agreed upon by the county court and the direct ors of the railroad company in which stock was taken, and that this act was in force at the time the patents were made to the railroad com pany, and was ample authority for the conveyance, without the con sent of the taxpayers.

The able arguments of counsel, the several decisions of the supreme court of Missouri, and divers acts of the general assembly bearing upon the necessity for a preliminary election, would command critical con sideration, if the question involved were an open one to this court; but, in my opinion, the decree of July 2, 1869, in the case of Butler county et al. against the Cairo & Fulton Railroad Company et al., concludes the complainant on this question. That suit was instituted by Butler county against the railroad company and the trustees of the bondholders for the purpose of annulling the county's subscriptions to the capital stock of the railroad company, and for the purpose of set ting aside the patent of April 20, 1857, from the governor of Missouri to the railroad company, and the mortgage, of date May 23, 1857, from the railroad company to the trustees for the bondholders,—Moore, Wilson, and Waterman. The ground of complaint was that the title to the lands involved was procured from the county fraudulently and without warrant of law, and that, among other things, there was no consent of the taxpayers thereto. The suit, after pending three years or more, came on for a hearing upon the merits; and a final decree was rendered as prayed for by the county, setting aside and annulling the title of the railroad company and the trustees for the

bondholders. This decree, if valid, is binding upon the parties to that case, and all others in privity with them,—including, of course, any subsequent purchasers under the annulled mortgage.

I am unable to agree with counsel for complainant that said decree was void for want of necessary parties. The suit was instituted in June, 1866. John Moore, John Wilson, and Albert G. Waterman, the trustees named in the mortgage of 1857, which was duly recorded in the recorder's office of Butler county, were named as defendants in the case; and being nonresidents at the time of the execution of the mortgage to them on May 23, 1857, and supposed to be so in 1866, an order of publication was secured and duly executed against them as such nonresidents, requiring them to appear at the September term of said court and answer the petition of the plaintiff. But it now appears that Waterman died in February, 1862, and that Moore died on September 23, 1866, before the order of publication was returnable. Wilson alone survived. Notwithstanding the death of Waterman and Moore, counsel entered appearance and filed pleadings for all the defendants. The case took the usual course, and was tried, and the decree was entered in July, 1869, with no knowledge on the part of Butler county of the death of the two trustees, or of any irregularity in the proceedings. By the provisions of the mortgage of 1857, the land therein described was conveyed to John Moore, John Wilson, and Albert G. Waterman, and "to the survivor and survivors, successor and successors, of them, forever, as joint tenants, and not tenants in common, for the uses and purposes set forth." The mortgage also provided:

"That, for the purpose of continuing and securing the due execution of the trusts hereby created, it is declared that all vacancies that may occur in the office of trustee, by death, resignation, or otherwise, shall be filled thus: The first vacancy shall be filled by a majority of the members of the board of trustees as constituted, being in office at the time such vacancy shall take place; the next vacancy shall be filled by the said party of the first part [which is the Cairo & Fulton Railroad Company]; and so on alternately, until the end. And trustees so appointed shall fill the terms and succeed to and perform all the duties, and have all the powers, hereby conferred upon the members of the board of trustees herein named or provided for."

It appears that an attempt was made, pursuant to the provisions of the mortgage, to appoint a successor to Waterman, who died in 1862. One Mason Brayman had, before then, pursuant to the provisions of the original mortgage, been chosen by the three original trustees as president of the board of directors. On March 22, 1866, he and John Wilson signed a paper at Springfield, Ill., the home of the trustees, and where they seemed to have had an office, purporting, by its terms, to appoint the said Brayman a trustee to fill the vacancy caused by the death of Albert G. Waterman. It also appears that after the death of John Moore, to wit, on April 11, 1867, the board of directors of the Cairo & Fulton Railroad Company, purporting to act under the power conferred by the original mortgage, passed a resolution appointing Henry H. Bedford as trustee to fill the vacancy occasioned by the death of John Moore; and a writing embodying this resolution and this appointment was signed by Green L. Poplin, president, and T. W. Johnson, secretary, of the railroad company. These appointments, it ap-

pears, were recorded on what purport to be the minutes of proceedings of the board of trustees, at Springfield, Ill., and of the railroad company, at Bloomfield, Mo. They were not sealed or acknowledged by the persons signing them, and were never recorded in the recorder's office of Butler county, wherein the lands affected by them were situate. It appears that Butler county, or its attorneys, had no actual knowledge, either of the death of these two trustees, or of any appointment of their successors, until long after the final decree in question. By the public records, Moore, Wilson, and Waterman appeared to be the trustees holding the legal title, and therefore the proper parties to be made defendants. By the public records, also, as shown in the original mortgage, duly recorded, it appeared that, in case of the death of one or more of such trustees, the survivor or survivors took the sole title. The county might reasonably suppose, in the absence of knowledge to the contrary, that the three trustees named in the mortgage, who were nonresidents of this state, were living at the date of the institution of the suit; and the county might confidently rely, by reason of the legal situation created by the mortgage, that if, perchance, one or more of such original trustees were then dead, the survivor or survivors were fully vested with the title; and as it appears that one of them (Wilson) was living at the time of the institution of the suit, and at the time of the return of process, and at the time of the trial of the cause and entry of the decree, service upon him was effective to subject the trust estate represented by the mortgage to the jurisdiction of the court in that case, unless such appointments of successors of the deceased trustees had been so made as vested them with title as joint tenants with Wilson. This necessitates an inquiry into the sufficiency of the appointments of Brayman and Bedford. It is claimed by counsel for complainant that the appointment of a substituted trustee, under the provisions of the mortgage in question, was but the exercise of a power, was not required to be made by deed, did not amount to a conveyance of real estate, and therefore was not within the requirements of our registry acts, and that their validity is in no manner affected by the fact that the public records of Butler county failed to show them. This contention has much force, but does not appear to have met with favor by the supreme court of Missouri in the case of F. G. Oxley Stave Co. v. Butler Co., 121 Mo. 614, 26 S. W. 367, in which the view is expressed to the effect that Butler county was not chargeable with notice of the substitution of trustees, in the absence of actual notice, or constructive notice resulting from recording the instruments making such substitution. There are, moreover, additional reasons why the decree of 1869 is not invalidated for the reason that Brayman and Bedford were not made parties. There was no evidence before the circuit court of Butler county that Brayman or Bedford ever accepted the trust or acted as such trustees, even if they were lawfully appointed as such. The facts that Bedford acted as counsel for the defendants of record, was possessed of knowledge of the facts, and did not disclose that he himself was a substituted trustee, impel me to the conclusion that if he knew of the transactions conducted at Springfield, Ill., and Bloomfield, Mo., to make Brayman and himself trustees, he at least had concluded not to accept the honor.

This is the only conclusion consistent with common honesty. If, therefore, notwithstanding the fact that the appointments of Brayman and Bedford were unacknowledged and unrecorded, they could be held effective as tenders of appointment, it may be that a nonacceptance of the trust was found by the circuit court of Butler county. At least, such a presumption may well be indulged in favor of the jurisdiction of that court, possessed as it was of general jurisdiction, in order to support its decree.

It is next contended that the Cairo & Fulton Railroad Company had been dissolved by the sale made on October 1, 1866, to enforce the state's lien for money loaned to it, pursuant to the provisions of the act of February 19, 1866, commonly known as the "Sell-Out Act," and that, such being the case, the last board of directors became thereafter trustees for the railroad company, and that they, instead of the president of the railroad, Mr. Poplin, should have been served with process in the case of Butler county against the railroad. It seems to me that a complete answer to this contention is found in the provisions of the last-mentioned act, as follows:

"Nothing in this act shall be construed as to convey or authorize to be conveyed, to the purchasers of said railroad, any of the lands subscribed by the counties to the stock of said railroad company."

In other words, the act in question did not authorize the sale, and no sale was made, of a large quantity of lands belonging to the railroad company. Butler county alone had, as then supposed, conveyed over 100,000 acres of swamp lands to this railroad company; and other counties had in like manner conveyed to it, as I understand, over 300,000 acres more of such lands. Although the railroad company had mortgaged its lands, the equity of redemption still remained in it. Considering the fact that the railroad itself was never completed, it seems to me that there was probably less in fact conveyed to the state under the sell-out act than was allowed to remain unsold under its provisions. Be this, however, as it may, the mere insolvency of the corporation, or the sale of the larger portion of its assets, does not necessarily work a dissolution. Hill v. Fogg, 41 Mo. 563; Bank v. Robidoux, 57 Mo. 446; Hotel Co. v. Sauer, 65 Mo. 279; F. G. Oxley Stave Co. v. Butler Co., 121 Mo. 614, 26 S. W. 367. The cases relied upon by counsel for the complainant, namely, Opinion of the Judges, 37 Mo. 129, Moore v. Whitcomb, 48 Mo. 543, and Chouteau v. Allen, 70 Mo. 290, in which some expressions are found substantiating their views, deal with cases in which there had been a sale of all the property of the corporation, or in which a dissolution was admitted by the pleadings. These last-mentioned cases are considered by the supreme court of Missouri in the F. G. Oxley Stave Co. Case, supra, and their authority is gravely doubted; and, notwithstanding them, the court holds that service upon the president of the railroad company, instead of upon the members of the last board of directors, was, at the worst, an irregularity which might have been corrected if seasonably suggested, and affords no ground for vacating the judgment rendered, at the suit of Mr. Chouteau or his grantees. To the same effect is the case of Hotel Co. v. Sauer, supra. Taking all these cases together, and giving them due consideration, I cannot hold that the

Cairo & Fulton Railroad Company was so dissolved as to render service of summons upon its president ineffectual to bind the railroad company. Not only is it true that the railroad company was the owner of the unsold lands, but the proof shows a continuous and necessary exercise of the functions of a corporation long after the sale of 1866. Stockholders' meetings and meetings of its board of directors were held at the call of Mr. Poplin, the president of the company. The appointment of Bedford as a successor to John Moore, trustee, which the complainant invokes in aid of his rights, and upon which he must rely as a valid act of the railroad company, was made by authority of the board of directors, and executed by the president of the company, after the sale under the sell-out act had been made. As late as 1870 the railroad company brought suit in the Butler county circuit court against the trustees and Chouteau and Poplin to set aside deeds of trust on the ground that the same had been obtained from the company by fraud. Later, in 1871, the railroad company brought suit in the same court to vacate the decree of July 2, 1869, upon the ground that it had been obtained by collusion and fraud. This last-mentioned suit, it may be proper here to say, was never pressed to a final hearing, but dismissed by the railroad company. All of these acts were corporate acts exercised by the company, and necessary to the preservation and disposition of corporate assets and the assertion of corporate rights. It cannot be held, on this state of facts, and on applicatory authority already cited, that the railroad company was so dissolved by the sale to the state in 1866 as rendered its last board of directors trustees, and thus necessary parties to the suit of Butler county against the railroad in question. Service was made upon the president of the corporation according to law, and the corporation duly appeared and contested the suit. The court therefore acquired full jurisdiction over the owner of the equitable title to the lands in controversy. I have already shown that it had full jurisdiction over the holders of the legal title. No question is made but that it had jurisdiction over the subject-matter. In my opinion, therefore, it had full jurisdiction over the case, and all parties are concluded by its decree.

The supreme court of Missouri has carefully considered all these questions in the case of F. G. Oxley Stave Co. v. Butler Co., supra. That suit was instituted by the plaintiff, who claimed title, as the complainant in this case does, by conveyances from Chouteau, and was instituted for the express purpose of setting aside the decree of 1869. All of the grounds of objection to that decree which are now made before this court were fully presented to the supreme court in that case. The last-named court took substantially the same views as I have taken, and in addition thereto announced a salutary, and, in my opinion, correct, doctrine, applicable to this case, and which effectually disposes of all the questions already considered, namely, that the delay of nearly 30 years by persons claiming these lands adverse to Butler county constitutes such laches as deprives them of any standing in a court of equity to aid their own title by destroying the county's muniment of title afforded by the decree of 1869. This principle is also distinctly announced in the case of Boone Co. v. Burlington &

M. R. R. Co., 139 U. S. 684; 11 Sup. Ct. 687. The supreme court of the United States, to which the case of F. G. Oxley Stave Co. v. Butler Co. was taken by writ of error (17 Sup. Ct. 710), says as follows:

"The supreme court of Missouri properly said that only two questions were presented by the record for its determination: First. Were the subscriptions by the county courts [county and district] of Butler county to the stock of the Cairo & Fulton Railroad Company, and the conveyance of the swamp lands of that county to said railroad in satisfaction of said subscriptions, authorized by law? Second. Ought the decree of the circuit court of Butler county annulling the conveyances of said lands to be set aside for the reasons urged by the plaintiffs, to wit—First, because procured by fraud; and, second, because two of the defendants named in it were dead at the time of its rendition, and the railroad company a dissolved corporation?"

After stating the foregoing propositions as having been presented, the supreme court of the United States says:

"Whether the subscriptions by the county court of Butler county to the stock of the railroad company, and the conveyances to that company, were valid, and whether the decree which the plaintiffs sought to have declared void was obtained by fraud, were questions of local law or practice, in respect of which the judgment of the state court was final."

This expression of opinion of the supreme court would have concluded any and all consideration of the questions already discussed, had not counsel for complainant, invoked the fourteenth amendment to the constitution of the United States, and claimed that he, or his grantees in title, had been deprived of their property without due process of law. This contention, which, for the reasons stated by Mr. Justice Harlan in pronouncing the opinion of the supreme court, could not be considered by the supreme court, necessitated my ruling upon the questions already considered, namely, whether Brayman and Bedford, and the directors of the Cairo & Fulton Railroad Company in office immediately prior to the sale of that road under the sell-out act, were necessary parties to the suit of Butler county against the Cairo & Fulton Railroad Company. In view of what has already been said in discussing these questions, it is my opinion that they were not necessary parties, but that all necessary parties were before the court in that case, and therefore that the complainants, who claim under the parties defendant in that case, were not, by the decree in that case, deprived of their property without due process of law.

The foregoing considerations result in the conclusion that complainant has no legal title to the lands in question by virtue of the sale under the decree of foreclosure rendered in 1879 in the suit of Chouteau against the Cairo & Fulton Railroad Company et al. But counsel contend that Butler county, and its grantees under its patents to the St. Louis, Iron Mountain & Southern Railway Company (hereafter called the "Railway Company") of 1874, and others, are estopped from asserting aught against complainant's title; and this by reason of the fact that the county assessed taxes against Chouteau upon the lands in question, and collected the same from him and his grantees, for several years after the date of his purchase, in 1882, and that the Railway Company knew of such assessment and payments, and allowed the same to be done. It is the settled law of this state that the assessment against, and collection of taxes from, a person, by a county of

this state, do not estop the county from afterwards asserting its own title to the lands against which such taxes were assessed. City of St. Louis v. Gorman, 29 Mo. 593; City of Hannibal v. Draper's Heirs, 36 Mo. 332; Sturgeon v. Hampton, 88 Mo. 203; Hooke v. Chitwood, 127 Mo. 372, 30 S. W. 167. In addition to this, the facts of the case do not, in my opinion, justify the application of the doctrine of equitable estoppel. From 1882 to 1893, during which time taxes were being paid by Chouteau and his grantees, there was unquestionably a spirited contention between Chouteau and his grantees, claiming title, notwithstanding the decree of 1869, under the foreclosure proceeding, and Butler county and its grantees, claiming title under patents made after the decree of 1869, as to which title should prevail. Chouteau must be presumed to have known that his legal title was cut out by the decree of 1869, and that notwithstanding his purchase, in 1882, there was a serious infirmity in his claim to equitable title. He assumed to believe that the decree of 1869 would be held nugatory and void as to him, and instituted, or caused to be instituted, the suit of F. G. Oxley Stave Co. v. Butler Co., supra, for that purpose. Pending a hearing and determination of that suit, Chouteau manifestly desired to bolster up his title, if possible. Accordingly, soon after his purchase, in 1882, he voluntarily paid delinquent taxes assessed against the lands in controversy,—induced the county court to assess the same in his name for the year 1883. This assessment was afterwards set aside and annulled by the county court, presumably because the title stood, apparently, in the Railway Company, under the grant of the county made in 1874. This action of the county court was so unwelcome to Mr. Chouteau that he employed an attorney to appear before the court to reinstate the assessment against him. This was accomplished in 1885, after several appearances; and he finally succeeded, on March 4, 1885, in getting a special tax book made, assessing these lands to him; and he paid taxes, and continued to do so for eight or ten years thereafter. The question is whether the payment of taxes under such circumstances, and the receipt of them by the county, with the knowledge of the Railway Company, amount to an estoppel on the part of the county or the Railway Company against claiming any title to such lands adverse to the Chouteau title. In my opinion, there are two satisfactory reasons why no estoppel arises out of such facts: First, Chouteau, and those claiming under him, knew that, according to the court and land records of Butler county, a perfect legal title to the lands in question was vested in Butler county and the Railway Company; and, second, no deceit, fraud, or concealment of any kind was practiced either by Butler county or the Railway Company to induce Chouteau to pay the taxes. On the contrary, the county protested against his paying them, to the extent, at least, of once striking the lands off the assessment, as against Mr. Chouteau's name. The Railway Company made no representations, concealed no facts, or took no steps whatsoever to induce Chouteau to take up or carry his self-imposed burden. Conveyances evidencing its title to the lands stood recorded in the public records of the county. Its name appeared on the assessment books as the owner of the lands until Chouteau made his purchase, and Chouteau voluntarily paid all

delinquent taxes. The facts, in my opinion, all show that Mr. Chouteau, with his eyes wide open to all the facts, and with full knowledge of the real title, with no deception, fraud, or misrepresentation on the part of the real owner, set about creating a title by adverse possession, against the real owner, if possible. This, in my opinion, is not such a laudable and praiseworthy project as to particularly inspire a court of conscience to lend its aid in its accomplishment. How well he succeeded in this will be presently shown. It is sufficient to say that, in my opinion, the facts in this case do not permit the application of the doctrine of estoppel in aid of complainant's title, as against either the county or the Railway Company. Brant v. Iron Co., 93 U. S. 326; Steel v. Refining Co., 106 U. S. 447, 1 Sup. Ct. 389; Merrill v. Tobin, 30 Fed. 738.

Complainant next claims that he has acquired title to the lands in controversy by adverse possession by himself and his grantor. In considering this question, it is well to start out with the undisputed fact that the lands are what is known as "swamp or overflowed lands." Neither Mr. Chouteau nor his grantee, the complainant in this case, have ever had the actual possession, in the sense in which these terms are employed in speaking of cultivated lands, but it is claimed that they have had all the possession which wild lands are susceptible of. This is claimed to consist in certain surveys, blazing trees, running off of squatters, prosecuting trespassers, and generally keeping an eye on the lands. The evidence in relation to all these acts is extremely general, and, indeed, the cross-examination of the witnesses produced to prove them shows that the "interest lands," as they are called, which are not involved in this case, were the subject of many of the alleged proprietary acts of Mr. Chouteau. All these acts, whether applicable to the lands in question or to the "interest lands," appear by the proof to be unsubstantial in character, and entirely insufficient to establish that open, notorious, adverse possession, under a claim of right, which alone is held sufficient to destroy the title of the real owner. They signally fail to comply with the requirements laid down by the supreme court of Missouri for such purpose. In Musick v. Barney, 49 Mo. 458, it is said:

"It would endanger property rights to permit a loose claim to land, with such acts of ownership only as might be exercised without attracting the attention of the real owner, and without occupancy, to ripen into title. The indications of the claim of possession should be so patent that the real owner could not be deceived."

The following authorities are, in my opinion, conclusive against the claim of the complainant in this case: Leeper v. Baker, 68 Mo. 400; Pharis v. Jones, 122 Mo. 125, 26 S. W. 1032; Nye v. Alfter, 127 Mo. 529, 30 S. W. 186; Carter v. Hornback, 139 Mo. 238, 40 S. W. 893. In addition to this, the proof shows that the Railway Company was during all these years exercising acts of ownership, in offering to sell, and selling, parts and parcels of the lands in question, and that these lands were quite generally known throughout the community as "railroad lands,"—probably better known as "railroad lands" than as "Chouteau lands."

After giving a patient and impartial consideration to all the evidence in the case, guided by the true rules of interpretation as laid down by the supreme court, I am unable to find that Mr. Chouteau's possession was so open, notorious, and visible as to deprive the true owners of their title. In my opinion, the loose and uncertain generalization of the witnesses with respect to Chouteau's possession, taken in connection with the evidence of acts of ownership of the Railway Company, whatever they may be worth, leave this case a very proper one for the application of the general rule that possession follows him who has the better title. Complainant's bill must be dismissed.