[No. 8965.    Department One.    January 17, 1911.]

A. J. PETTICREW et al., Appellants, v. BELLE GREENSHIELDS, Respondent.[1]

ADVERSE POSSESSION—GOOD FAITH—NECESSITY. The grantee in a quitclaim deed having knowledge that the grantor was a stranger to the title and that the title was vested in another, cannot show good faith or gain title by adverse possession, under Rem. & Bal. Code, § 788, giving title by adverse possession under claim and color of title made in good faith, and the payment of taxes for seven years.

ADVERSE POSSESSION—VACANT LAND—ACTS OF OWNERSHIP. The occasional hauling of wood for domestic use from a tract of 640 acres of land, wholly unoccupied and unimproved, is not such an act of adverse possession as to indicate a claim of title.

[1]Reported in 112 Pac. 749.

DEEDS—DELIVERY—ACCEPTANCE—RATIFICATION. The procuring of a deed from a railroad company by a banker, who looked after the interests of the grantee and made final payment, is a sufficient delivery to the grantee, with acceptance and ratification by him, where he thereafter tried to obtain a statement from the banker and settle with him.

EQUITY — LACHES —QUIETING TITLE —LIMITATION OF ACTIONS. Laches will not prevent the quieting of title to land, if suit is brought within the period of the statute of limitations, if the equities involved do not call for the exercise of the discretion of a court of equity.

Appeal from a judgment of the superior court for Lincoln county, Huneke, J., entered March 16, 1910, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action to quiet title. Affirmed.

*H. J. Hibschman,* for appellants.

*Sessions & Warren* and *Mark F. Mendenhall,* for respondent.

PARKER, J.—This is a suit to quiet title to a section of land in Lincoln county. It was originally commenced by A. J. Petticrew and Anna B. Hamilton as plaintiffs, against Charles Greenshields and others as defendants. Before the trial, Anna B. Hamilton died, and prior to her death she had conveyed her interest in the land to her husband, W. F. Hamilton, who was substituted as plaintiff in her place. The defendant Charles Greenshields conveyed his interest in the land, before the trial, to his daughter Belle Greenshields, when she intervened claiming to be the sole owner of the land. This controversy is now being waged between A. J. Petticrew and W. F. Hamilton, each claiming to be the owner of an undivided half of the land, and Belle Greenshields, claiming to be the sole owner of the land. All questions touching the present rights of the other parties to the cause have been eliminated. A trial upon the merits resulted in a decree in favor of the intevener, Belle Greenshields, decreeing her to be the owner of the land and quieting her title thereto as against the

claims of the plaintiffs, upon condition, however, that she pay to the plaintiffs, within ninety days from March 4, 1910, certain sums found to have been paid out by them and Anna B. Hamilton, on account of purchase price of the land, and taxes. From this decree, the plaintiffs have appealed.

The material facts upon which the rights of the parties depend may be summarized as follows: Charles Greenshields came to Lincoln county from Michigan in the fall of 1888, his object being to purchase land. In November of that year he acquired, by assignment from one Weaver, a contract for the purchase of this land from the Northern Pacific Railway Company, the first payment only having been made thereon. He then returned to Michigan, and came back to Lincoln county in February, 1889. Soon thereafter he was joined by Anna B. Monarch, who lived with him there as his wife, and became there known as Mrs. Greenshields, and some years later became Anna B. Hamilton, the wife of appellant Hamilton. Greenshields and Mrs. Monarch lived on another tract of land in Lincoln county, which had been bought in her name. • This is referred to by some of the witnesses as, "her place" or "the home place." When they went to the home place to live, the appellant Petticrew went there to work for Greenshields. In the fall of 1889 Greenshields and Mrs. Monarch had a falling out, when he went away and never returned. Appellant Petticrew stayed and worked for Mrs. Monarch for several years thereafter. Mrs. Monarch conducted her farming business in the name of Anna B Greenshields, and appellant Petticrew acted to a considerabl extent as her agent, attending to the marketing of crop:, depositing proceeds thereof in the bank at Davenport, and even signing her name to checks upon the bank. One C. C. May was the cashier of the bank. He looked after some intrests of Greenshields after he went away, and was also a friend and business adviser of Mrs. Monarch. In June, 1891, May paid to the railway company the balance due upon the land contract, when the railway company issued a deed there-

for in Greenshields' name, delivering it to May. This deed was not recorded until 1907. In the meantime the bank had become insolvent and passed into a receiver's hands, and May became a fugitive from justice. The deed was found thereafter among the bank's papers, and recorded at the instance of Greenshields. Some correspondence between May and Greenshields, about the time of and after the final payment to the railway company by May, convinces us that May made this final payment for Greenshields, whether with funds of his own or with funds of Greenshields is not clear. In any event he then informed Greenshields that he had settled with the railway company, had received "the papers," evidently meaning the deed, and that he would soon send a statement. Greenshields appears to have made efforts to procure a settlement with May thereafter, but was never able to do so.

Prior to the spring of 1899, the land was wholly unimproved and wholly unoccupied. No physical use had ever been made of the land by any one, save appellant Petticrew had occasionally hauled some fire wood from it for Mrs. Monarch for domestic use. The taxes accruing on the land prior to 1899 were paid either by May or the respondent. These payments we think were made for Greenshields. On June 23, 1899, May executed and delivered to Mrs. Monarch a quitclaim deed for the land, reciting a consideration of one dollar. It is claimed that she then paid him $665 for it. This deed is relied upon by appellants as constituting their color of title. Under it and subsequent conveyances from Mrs. Monarch, they claim that she and they have held the physical possession of the land, claiming title thereto in good faith, and paid taxes thereon for a sufficient length of time to perfect their title thereto under the seven-year statute of limitations. At about the time of acquiring this deed, the land was fenced by appellant Petticrew for Mrs. Monarch, he being then still in her employ. It was thereafter used for pasture, and a considerable portion of it was cultivated and crops raised on it by Petticrew for Mrs. Monarch and him-

self, she having deeded to him an undivided half interest therein. The use and possession of the land has, since June 1899, been continuous in Mrs. Monarch, who later became Mrs. Hamilton, and appellants. Since June 1899 the taxes have been paid by Petticrew or Mrs. Hamilton.

It is clear that Petticrew knew that Greenshields owned the land at the time of and prior to the giving of the quit- claim deed by May to Mrs. Monarch. He not only knew this from his conversations with May at that time, but he evidently knew it from his acquaintance and association with Greenshields some years before. The knowledge which Mrs. Monarch had of Greenshields' interest in the land at the time she received the quitclaim deed from May in June, 1899, does not appear by direct and positive evidence; but it seems to us there is sufficient evidence of a circumstantial nature to warrant the conclusion that she did then know of Greenshields' title to the land. Let us notice some of these circumstances. We have noticed that Petticrew was acting as agent for Mrs. Monarch to a considerable extent. He marketed her crops, received and deposited the money therefor, and even paid out money by signing checks for her. The talk he had with May, in which he admitted that he learned of Greenshields' owner- ship of the land, evidently occurred on the day that May gave the quitclaim deed to Mrs. Monarch. He does not seem to remember whether or not she was present at that conversa- tion, but his testimony renders it highly probable that she was present and learned all that he did at that time as to Greenshields' title, if she did not know it already. Petticrew testified on direct examination, in part, about this conversa- tion, as follows:

"By Mr. Hibschman: Q. Did you say anything further at that time to Mr. May about the payments on the land? A. When they made final payments and made this deed, why she wanted him to send that deed to Greenshields and have it signed to her which he said he did and he wrote back here and said that he would not sign it unless she paid him his first payment back. Q. Now you know this of your own

knowledge? A. Yes. . . . . . . Q. This is what May told you? A. Yes. . . . . Q. Where were you at the time this conversation took place in which Mr. May told you there was a deed to Greenshields? A. I was in May's bank. Q. Was Mrs. Monarch there? A. I don't remember as she was. Q. Did he say anything more than just tell you there was a deed there from the railroad to Greenshields? A. He said he would sign the deed provided .she paid this payment that he had paid and she said she would not do it unless— . . . . A. —Mrs. Monarch said she would not pay that back because her money made the first payment. Q. She said this to May? A. She said it to May and said it to me, and May had told me that. Q. May had told you too? A. Yes. Q. Was that the reason you said a moment ago you thought the land belonged to Mrs. Greenshields? A. Yes. Q. Did May say anything as to whether or not the deed to Greenshields had been re-corded? A. He said it had never been recorded. Q. Did he say why not? A. No, he did not. Q. Did he tell you why he happened to have it? A. He said because there were several payments and the deed was to go to him. When the railroad deed was issued he got it and he said he had an equity .of it at that time."

On cross-examination Petticrew testified in part as follows:

"A. I brought the checks into the bank and Mrs. Greenshields was there. Q. Mrs. Greenshields was there? A. She was there and got the deed. Q. Was Mrs. Greenshields there when you took that money there? A. She certainly was. Q. Mrs. Monarch? A. Yes. Q. Didn't you say a moment ago that she was not there when you brought the money for Mrs. Greenshields and put it in the bank. She was in there at that time? A. She was at the bank. . . . . . Q. You say now that Mrs. Monarch was there? A. On the date she got the deed. Q. I mean the·day you sold the crop you testified about awhile ago? A. The same date."

The intimate relations existing between Mrs. Monarch and Greenshields after he had acquired the contract for this land ·also indicates that she knew of his claim to it. Petticrew ·and Mrs. Monarch may have had some reason for believing

that May had some claim upon the land to secure the repay-' ment of money advanced by him for Greenshields, but we cannot escape the belief that they both knew that May had no title to or right to convey the land, as he then attempted to do by the quitclaim deed to Mrs. Monarch.

The principal contention of learned counsel for appellants is that they have acquired title to this land by actual possession under claim and color of title made in good faith, under the seven-year statute of limitations, which provides:

"Every person in actual, open and notorious possession of lands or tenements under claim and color of title, made in good faith, and who shall for seven successive years continue in possession and shall also during said time pay all taxes legally assessed on such lands or tenements, shall be held and adjudged to be the legal owner of said lands or tenements, to the extent and according to the purport of his or her paper title." Rem. & Bal. Code, § 788.

It may be conceded that the quitclaim deed from May to Mrs. Monarch, under which appellants claim, constitutes upon its face color of title, and that the possession thereunder and the payment of taxes has extended over the period of seven years. The only remaining question under this contention then is that of the good faith of Mrs. Monarch and Petticrew in acquiring the quitclaim deed from May and making their claim of title thereunder. This question depends upon the knowledge possessed by them at the time of procuring this deed on June 23, 1899, touching the right and title of the real owner of the land at that time. We have seen that Greenshields was then the owner, that May had no right whatever to convey the land, and that Mrs. Monarch and Petticrew then knew these facts. This renders the law of this branch of the case comparatively a simple matter. In the case *of Brodack v. Morsbach*, 38 Wash. 72, 80 Pac. 275, discussing this seven-year statute, we said:

"While under the general statute of limitations the elements of good faith may not enter into the claim of the party

holding adversely, yet the appellants are claiming under a special statute which makes the *bona fides* of their claim a prerequisite to a recovery. Under this statute a mere notice of an adverse claim, which the party in possession believes in good faith to be ill-founded, will not bar a recovery, but when, as in this case, the parties claiming by adverse possession have actual notice that there is an adverse claim to the property, or an interest therein, and that such claim is superior and paramount to the claim or interest which they acquire under their paper title, their possession is not 'under claim and color of title, made in good faith.' *Arnold v. Woodward,* 14 Colo. 164, 23 Pac. 444; *Latta v. Clifford,* 47 Fed. 614; *Hunt v. Dunn,* 74 Ga. 120; *Templet v. Baker,* 12 La. Ann. 658."

See, also, *May v. Sutherlin,* 41 Wash. 609, 84 Pac. 585; *Compton v. Newton,* 129 Ga. 619, 59 S. E. 270; *Jasperson v. Scharnikow,* 150 Fed. 571, 15 L. R. A. (N. S.) 1178, 1248 note; *Power v. Kitching,* 10 N. D. 254, 86 N. W. 737, 88 Am. St. 691, 716, note.

We are of the opinion that appellants' claims to this land are not made in good faith within the meaning of this statute, and hence have not ripened into title, though their possession and payment of taxes appears to have covered a period of more than seven years.

Some contention is made that appellants have acquired title by adverse possession under the ten-year statute. But clearly ten years did not elapse from the commencement of the actual physical possession of Mrs. Monarch to the filing of respondent's complaint in intervention, which, for the purpose of this inquiry, may be considered the commencement of her action to recover the land. The exercising of the alleged acts of ownership by Petticrew and Mrs. Monarch prior to the spring of 1899, about the date of the quitclaim deed from May, in no event consisted of anything but an occasional hauling of wood for domestic use, from the land. This was clearly not such an act of adverse possession as to indicate that they were claiming title to this large tract of land consisting of six hundred and forty acres.

It is contended that Greenshields never accepted the deed from the railway company, and for that reason never acquired title to the land. We think the relationship existing between May and Greenshields fully warrants the conclusion that May procured the deed for Greenshields, that Greenshields ratified May's acts in procuring the deed, and thereafter tried to procure a statement from and settle with May on account of the money paid by May to the railway company.

It is contended that Greenshields and his daughter, the respondent, have been guilty of such laches in asserting their right to this land as to preclude recovery in this action. We are unable to see any sound reason for the application of the doctrine of laches to this controversy. The legislature has fixed the limit of time by statutes of limitation, within which rights may be asserted such as respondent here claims by her intervention. The period so fixed by statute had not expired when she intervened. The equities here involved do not, in our opinion, call for the exercise of that discretion of a court of equity sometimes exercised in its refusal to enforce claims which may not be technically barred by statutes of limitation.

On the question of the amount of money required by the decree to be paid to appellants by respondent on account of purchase price paid by Mrs. Monarch to May, and on account of taxes paid since then, we think the learned trial court had done them full justice, especially in view of the use which Petticrew and Mrs. Monarch had of the land for several years. We are of the opinion that the rights of the parties have been properly determined. The judgment is affirmed, with directions to allow respondent ninety days from the filing of the remittitur upon this decision in the superior court to pay the sums awarded to appellants by that court.

RUDKIN, MOUNT, GOSE, and FULLERTON, JJ., concur.