PHILBIN ET AL. *v.* CARR ET AL.

[No. 9,825. Filed November 23, 1920. Rehearing denied February 15, 1921. Transfer denied May 18, 1921.]

1. ADVERSE POSSESSION.—*"Color of Title."*—"Color of title" is that which in appearance is title, but which in reality is not, and it must rest on some writing upon its face professing to pass title, but which does not do so for the reason that the grantor lacks some requisite essential to the conveyance of an absolute title. pp. 573, 578.

2. ADVERSE POSSESSION.—*Parol Evidence.—Competency.*—Adverse possession may be shown by parol evidence as in cases of parol gifts or attempted parol conveyances. p. 577.

3. ADVERSE POSSESSION.—*Evidence.—Void or Worthless Deed.*— A void or worthless deed is admissible in evidence to show that the possession of one occupying land is adverse, but when received solely for that purpose its admissibility does not rest on the ground that it constitutes color of title, but rather on the ground that it is a circumstance tending to show that the possession has been under a claim of ownership or title. p. 577.

4. ADVERSE POSSESSION.—*Color of Title.—Oral Gift of Land.— Statutes.*—Sections 1127, 1128 Burns 1914, §§1080, 1081 R. S. 1881, declaring that a purchaser in good faith at any judicial or tax sale and any occupant who can show connected title from records of any public office, etc., has color of title, are

exclusive as to what constitutes color of title, so that an occupant to whom a grantee made an oral gift of land, and with whom he left the deed to himself, did not have color of title, since such a case is not within the meaning of color of title as defined by such statutes. (*Bell* v. *Longworth* [1855], 6 Ind. 273; *Vancleave* v. *Milliken* [1859], 13 Ind. 105, and *Wilson* v. *Campbell* [1889], 119 Ind. 286, explained and distinguished; *Hitt* v. *Carr* [1915], 62 Ind. App. 80, overruled in part.)   pp. 578, 579.

5.   ADVERSE POSSESSION.—*Color of Title.—Availability.—Good-Faith Claimant.*—The doctrine of color of title is available only in cases where the instrument purporting to be a conveyance is accepted in good faith and in the honest belief that it invests the title in the claimant.   p. 578.

6.   PROPERTY.—*Legal Title.*—A title to land evidenced by conveyances, wills, decrees of court, and proof of heirship is a legal title, and, being created in accordance with statutory enactments, the highest evidence of ownership and is accorded the fullest protection of the law.   p. 581.

7.   TRUSTS.—*Implied Trust.—Proof.—Record Title.*—A record title to land may be overcome by facts sufficient to warrant a court in establishing an implied trust, but before a court will raise an implied trust, in opposition to the legal title, the proof of all the essential facts must be clear and unequivocal.   p. 582.

8.   PROPERTY.—*Record Title.—Overcoming by Adverse Possession.*—A record title may be defeated by adverse possession, but mere possession is the lowest form of ownership.   p. 582.

9.   ADVERSE POSSESSION.—*Elements.—Claim of Right.*—Before the owner of the legal title can be deprived of his land by another's possession through the operation of the statute of limitations, the possession must have been actual, visible, notorious, exclusive, under claim of ownership, hostile, and continuous for the full period prescribed by the statute of limitations.   p. 582.

10.   ADVERSE POSSESSION.—*Elements.—Actual Possession.*—Adverse possession, to ripen into title, must be actual, since the only constructive possession known to the law is that which inheres in the legal title.   p. 583.

11.   ADVERSE POSSESSION.—*Elements.—Visible Possession.—Notice.*—Adverse possession, to ripen into title, must be visible, so that the owner may have notice that his land is occupied by another who is claiming dominion over it.   p. 584.

12.   ADVERSE POSSESSION.—*Elements.—Possession.*—Adverse possession, to ripen into title, must be notorious so as to to be manifest to the people living in the community wherein the

VOL. 75—36

land is located, and, where the owner has no actual notice, the possession must have been so notorious as to warrant the inference that the owner ought to have known that a stranger was asserting dominion over his land, and insidious, desultory and fugitive acts are not sufficient for that purpose, it being necessary that the possession be clear and unequivocal.  p. 584.

13.  ADVERSE POSSESSION.—Elements.—Exclusive Possession.—
Adverse possession, to ripen into title, must be exclusive, as two or more persons cannot hold one tract of land adversely to each other at the same time, hence it is essential that the possession of the adverse claimant be of such an exclusive character that it will amount to an ouster or disseisin, and where the claimant occupies the land in common with third persons, or with the public generally, the possession is not sufficiently exclusive to constitute the basis of title.  p. 585.

14.  ADVERSE POSSESSION.—Elements.—Possession Under Claim of Ownership.—Adverse possession, to ripen into title, must be under claim of ownership, and the possession of a mere trespasser or squatter never can eventuate into title, for his possession is deemed to be in subservience to the owner.  p. 586.

15.  ADVERSE POSSESSION.—Elements.—Continuous Possession.—
Adverse possession, to ripen into title, must be hostile and the land held in direct opposition to the holder of the legal title and all others, excepting only the government.  p. 586.

16  ADVERSE POSSESSION. —Elements.— Continuous Possession.—
Adverse possession must be continuous for the full statutory period, the requirements of the law not being satisfied with an intermittent occupancy for the moment the land becomes vacant the law restores possession to the holder of the legal title.  p. 587.

17.  APPEAL.— Review.— Verdict. — Evidence. — Sufficiency. — A verdict for plaintiff will not be permitted to stand unless there is evidence, competent and substantial, tending fairly to prove each and every element essential to the cause of action.  p. 587.

18.  ADVERSE POSSESSION.—Legal Title.—Presumptions.—Burden of Proof.—All presumptions are in favor of the holder of the legal title and one claiming title by adverse possession has the burden of overcoming such presumptions by proof which must be strict, clear, positive and unequivocal, for a title by adverse possession may not be established by inference or implication.  p. 587.

19.  ADVERSE POSSESSION.—Requisites.—Intention of Occupant.—
The intention of an occupant of land to claim ownership is an essential element to the acquisition of title by adverse possession.  p. 589.

20. ADVERSE POSSESSION.—*Possession.*—*Sufficiently to Ripen Into Title.*—In an action to quiet title based on adverse possession, *held* that claimant's occupancy and acts incident thereto were not sufficient to sustain a claim of title by adverse possession. p. 589.

21. ADVERSE POSSESSION.—*Wild Lands.*—*Requisite Character of Occupancy.*—The rule is applied with great strictness that, in order to acquire title by adverse possession to wild land, there must be actual occupation of it of such unequivocal character as will unmistakably indicate to the owner visiting the premises at any time during the statutory period, that someone has appropriated it to his own use and is asserting exclusive ownership thereof, instead of suggesting only occasional trespasses. p. 591.

22. ADVERSE POSSESSION.—*"Color of Title."*—*Statutory Definition.*—*Scope and Applicability.*—The statutory definitions of color of title contained in §§1127, 1128 Burns 1914, §§1080, 1081 R. S. 1881, are not limited as to their application to actions in ejectment, but are applicable to every case wherein the question of title is in issue, regardless of the form of the action. p. 593.

From Laporte Superior Court; *Samuel E. Cook,* Special Judge.

Action by Drusilla Carr against Jessie M. Philbin, Hattie E. Tyler, Daisy Holladay and others, in which the defendants named filed a cross-complaint. From a judgment for plaintiff, the defendants named appeal. *Reversed.*

*Crumpacker & Crumpacker, Hoag & Ullman, John L. Davidson* and *Osborn, McVey & Osborn,* for appellants.

*Henry Warrum* and *Everett G. Ballard,* for appellees.

Statement by Dausman, J.—This action was instituted by appellee Drusilla Carr in the Lake Superior Court, by filing her complaint to quiet title to the following described real estate in Lake county, viz.:

Lots 1 and 2, in section 31, in township 37 north, in range 7 west of the second principal meridian, and all that part of said section 31 lying north of said lots 1

and 2, above described, and all that part of said section lying north of the Indian boundary line.

Hiram Carr and a large number of other persons were made defendants. As to Mary H. B. Hitt, William W. Hall, Isaac R. Hitt, Arza B. Hitt, and Isaac R. Hitt Jr., the action was dismissed. Jessie M. Philbin, Hattie E. Tyler (now Hattie E. Hodge) and Daisy Holladay (now Daisy Holladay Brown), being the children of Lavina H. Holladay, deceased, and Jesse Holladay, deceased, filed an amended answer denying each and every material allegation of so much of the amended complaint as relates to said lot 2, and disclaimed any interest in the other real estate described in the amended complaint. All other defendants were defaulted.

Said Philbin, Tyler (now Hodge), and Holladay (now Brown), also filed a pleading which they denominated "cross-complaint," and by which they sought to quiet their title to said lot 2. Drusilla Carr and a large number of other persons were made defendants in the cross-complaint. Drusilla Carr filed an answer in denial to the cross-complaint, and all other defendants therein named were defaulted.

The cause has been twice tried. The first trial was in the Porter Superior Court, and the second in the Laporte Superior Court. Each trial resulted in a verdict and judgment for the appellee. From the latter judgment Jessie M. Philbin, Hattie E. Tyler (Hodge) and Daisy Holladay (Brown) have appealed. The defaulted parties have been made nominal appellees, but nothing has been presented as to them. The only controversy involved is wholly between the appellants and Drusilla Carr (hereinafter designated the appellee) and relates to the ownership of lot 2 only.

The following errors have been assigned: (1) That the Laporte Superior Court was without jurisdiction; (2) overruling appellants' motion for a continuance on

account of the illness of one of their counsel; (3) over-
ruling appellants' motion for a *venire de novo;* (4) over-
ruling appellants' motion for a new trial.

The evidence is unusually voluminous, covering more
than 660 pages of the transcript and 600 pages of ap-
pellants' printed brief.   The appellee claimed to be the
owner by adverse possession of all of section 31, and her
case was tried on the predominant theory that she had
color of title which extended her actual occupancy to the
boundaries thereof.   Consequently most of the evidence
concerning her occupancy relates to acts done elsewhere
than on lot 2.   The following plat of said section and
statement of evidential facts gleaned from the uncon-
troverted evidence, will be sufficient for a full and fair
understanding of the case:

Drusilla Carr is the widow of Robert Carr, deceased. She married Robert Carr on Christmas, 1875. At the time of the marriage Robert Carr lived in the vicinity of the land involved in this action, in a dugout, constructed of driftwood, completely heaped over with sand except the north end thereof, and located in a hollow about twenty rods from Lake Michigan and just across the Grand Calumet river from a place known as "The Blowout." He had lived there for a number of years with his father, William Carr; the father having died there about 1867. His father was a fisherman, hunter and trapper.

That region was then a wilderness, consisting mainly of sand dunes and swamps. There were some ponds, drainage in the form of a broad and shallow river, and here and there clumps of scrub trees. Mink, muskrats, and skunks were plentiful. There were some coon, wolves, and fox. Wild rice and ducks were plentiful in season.

During the two years next preceding his marriage, Robert Carr had with him a boy named Conklin. Robert Carr and this boy, with their seine and nets, took fish in large quantities from Lake Michigan and the river, which they sold at Chicago. They killed ducks in large numbers, and for these they found a ready market. They trapped mink, skunks, and muskrats for the fur. They picked berries, sand cherries, and wild grapes for their own use. They dug sassafras roots and sold some cedar posts and Christmas trees. They had a fish house and an ice house on the beach. They intended to live there "until they could get something better."

After his marriage Robert Carr and his wife continued to live in the same vicinity and in much the same way as he had lived before. There were numerous shacks along the beach, erected by fishermen and hunters who occupied them but a short time each year. The

Carrs helped themselves to these shacks when they were vacant. They would slip into these vacant shacks and remain until driven out by the owners. One of Mrs. Carr's friends, testifying in her behalf, said that the Carrs lived in so many different shacks that "it would take a Philadelphia lawyer to keep track of them." At one time they experimented with a garden, but the experiment failed because the hot and shifting sand was unfit for gardening. They would sometimes get firewood by taking limbs and trees that were down, stumps, and occasionally green pine. It was a common practice for them and other people to get loads of kindling wood, cordwood, and lumber from the shore where it had drifted at times of storm. They set their nets in Lake Michigan at a distance from the shore depending upon conditions. Sometimes they would put them out as far as a quarter of a mile from the shore. They had a fish house, an ice house, and a stable for their horse at the beach. For a number of years but little fishing has been done in the lake for the reason that the fish quit coming to that place. In recent years the Carrs maintained a bowery or dancing place which was patronized by picnic parties and at which refreshments were served. At one time they lived in a log cabin in the bend of the river, known as the "Crockett cabin." They lived in that cabin until it got so bad they were compelled to abandon it. Then they built "a room" out on the beach. The Crockett cabin was tumbling when they left it. The west side of it was heaped over with sand. The cabin blew down—went to pieces.

Other fishermen were located along the beach in front of section 31. They had the same kind of buildings as the Carrs had. "They all had the same kind of nets and seines and conducted their business the same as Robert Carr did, in a general way." Mrs. Caroline Carr, Peterson. Sabinskie, John Carr, Nelson, Stearns,

Zeek Conklin, Lightner, Pat Malone, Johnson, Blank, Jackson, and others had shacks, cottages, and other buildings along the beach in front of section 31.    These buildings were bought and sold with great frequency. Some of them were moved away; some blown away; some torn down and hauled away.    It was a great duck country and in the duck season the marshes were full of duck-hunters.    Sportsmen maintained clubhouses in that region, and hunters came from great distances to shoot duck there, including the land constituting said section.    A great many people trapped on the land— everybody who wanted to trap.    A kind of rough grass grew in the moist places, and cattle were fond of this grass.    The villagers and all others who cared to do so, pastured their cows there.    The appellee never kept a cow.

Robert Carr was a cripple and walked with a crutch. Much of the time he worked as a cartridge packer—an employment peculiarly suitable to him, because he could do the work while seated.    The manager of the Aetna Powder Mill testified that he took charge of the plant April 17, 1882; that Robert Carr was working there then and was living with his family at Miller; that he continued to work in the mill for thirteen years and his family continued to reside at Miller; that during the first eight or ten years of that period he worked continuously, but after that he worked off and on.

Mrs. Carr testified, in substance, as follows:

"After my marriage I first began housekeeping at the place called 'The Blowout;' East of the Calumet River and North of the village named Miller.    While we were living there in March, 1876, a man came who said his name was Bingham.    He said that in the East he had traded for some land in Section 31 and he wanted Mr. Carr to help him locate it.    My husband went with him in a boat across the river to the lake.    They returned

in the evening and Bingham stayed over night.  He was a tall, frail, sickly-looking man.  He said he was discouraged with his land; that he had been buncoed; that it was not worth the cost of recording the deed; that he would not get the deed recorded for it; that his best land was lot 1 and that lay in the river.  I said 'If you don't want it, give it to me.'  He answered: 'Mrs. Carr, if you will move on the land, you may have it.' The next day Bingham and my husband went out again, returning in the afternoon.  He stayed with us the second night.  On the evening of the second day Bingham said to me 'I have taken possession of this land.  I saw Crockett and told him I had given the land to you and that I wanted him to give you his cottage if you ask him for it.'  He asked me where we should find a Notary Public.  I told him at Hobart.  We could not very well go to Hobart with an ox-team and we could not walk.  He told me to read the description from his deed, that he might take a copy of it, and when he got home he would send me a deed.  I did so and he left his deed with me.  He left my house on the evening of the third day.  I never saw him after that.  I received a letter from him stating that he had lost his copy and asking me to send him the deed.  I sent the deed to him and never heard from him afterward.  I wrote him once after that but received no reply.  I remember what was in the deed.  It read 'We now convey to Bingham all the land in Sec. 31 laying between Lake Michigan and the Grand Calumet River, and West of its mouth to the section line west.'  If there was a date on it I have forgotten it.  I did not notice the names of the grantors.

"When Bingham gave me the land there was a little log shack north and a little west of 'The Blowout;' on the west side of the river.  Mr. Crockett was living in the house at that time.  My husband built a house at

the west end of the Section, just east of the west line of the section.   It was a log house, consisting of only one big room.   We lived in that house about a year and a half; then we moved into the Crockett house and Crockett went to the west end.   We made this change because our house 'wasn't daubed up or anything' and it was very cold down there.   The Crockett house was sheltered by a sand ridge; it had only one door; it had been chinked up, and we fixed it again and made it comfortable.   I was sick down at the other house; it was a poor house and not fit to live in.   We lived in the Crockett house 10 or 12 years.   From the Crockett house we moved out on the beach, north and west.   The Crockett house was getting old and wasn't fit to live in any more.   We decided we would go to the lake-front where it would be handier to my husband's business.   He was engaged in fishing.   That house had two rooms.   We built a barn, an ice-house, and a platform for a dancing pavilion.   When the gravel road was built we put rollers under that house, hitched a horse to it and moved it east of the gravel road.   I believe that was in 1896.   Since then we built a fish house, an ice-house, and two bath-houses.

"I owned a house at Miller and would go there in September when school commenced, and would stay there until the term closed.   I left furniture in the house and someone was there always while I was away.   We did that for several years.   After the pike was built the children went to school from the lake-front.

"I moved to Indiana Harbor in November, 1902.   My husband died there.   I moved back to the lake-front in February, 1904.   While I was at Indiana Harbor my son and a Mr. Adams took care of things at the lake-front.

"I never heard anything of lot 2 until this case was started; then it was shown to me on a map; I never paid

any taxes on this land. I never made any inquiry at the Recorder's Office to see whose name the land was in. I never made any inquiry at all to see whether Bingham had any interest of record. I never made any inquiry with reference to taxes or title. No one ever made demand on me for taxes on this land. I paid taxes on my property at Miller. I paid the taxes at Crown Point. I usually wrote and found out how much the taxes were, and then sent it. But I never wrote about this land."

The township assessor called on Mrs. Carr at her shack from time to time and assessed her, but she never informed him that she claimed to own this land—never mentioned the subject to him.

Counsel for the appellee contend that the following acts, which evidence the character of her occupancy, were done on lot 2 by herself and through her husband and sons:

They cut ice from the river with which to fill their ice house. Every spring they tarred their nets in the slough. The tar was heated in iron kettles and spread on the nets which were then stretched out to dry. Some of the nets were 500 feet long, and about two weeks were required for drying. They cut some fire wood, sold several loads of posts and timber, and cut some evergreens for the Christmas tree market. They picked sand cherries and wild grapes for their own use. In the spring they gathered and sold some sassafras.

Section 31 was subdivided by the United States Government, the surveys having been made as early as 1830. Lot 2 is bounded on the north by the Indian boundary line; on the east by lot 1; on the south by the Grand Calumet river; and on the west by the section line. The appellants are the owners of the legal title to lot 2. Their title is a complete record title, consisting of an unbroken chain of conveyances, court de-

crees, and wills.   Lavina H. Holladay became the owner by deed of conveyance dated August 25, 1882, and she devised lot 2 to her three daughters (the appellants herein) by her will, probated April 17, 1906.

Prior to the conveyance to Lavina H. Holladay, lot 2 was held in trust for a number of years by Jesse Holladay, trustee.   During his trusteeship he kept an agent at Miller to look after lot 2 and other adjoining land.   That agent was for a time the township assessor. The agent looked after people who had buildings on any part of the land under his care and collected from them a nominal rental to avoid any possible claim of adverse possession; but he never found the Carrs on lot 2 or on any of the other land under his care.

The taxes on lot 2 have been paid by the successive holders, of the legal title every year since (and including) the year 1843.   For many years the land was of little value.   In 1843 the taxes amounted to $3.20; in 1873, to $20.16; in 1883, to $14.40.   By reason of the fact that a certain large industrial concern had purchased land near lot 2, the land was assessed in 1891 at about $27 per acre and the taxes for that year amounted to $152.89.   For the next succeeding three years the taxes were about the same as in 1891.   In 1895 the taxes dropped to $61.72, and there was practically no increase until 1908, in which year the taxes amounted to $168.32.   The location of the town of Gary so near lot 2 and the construction of a belt railroad which touched the boundary of said lot, increased its value enormously, and in the year 1911 the taxes paid on said lot amounted to $732.40.

Dausman, J. (after making the foregoing statement) :

What is the origin and significance of the phrase "color of title?"   Literally, of course, it signifies that which resembles title, has the appearance of title, has

the semblance of title, looks like title, purports to
1. be title; but in fact is not title. Obviously that is
its general meaning; and its technical meaning
in the law is substantially the same, as the following
definitions will show:

. "Color of title may then be defined to be a *writing*,
upon its face *professing* to pass title, but which does not
do it, either from want of title in the person making
it, or the defective mode of conveyance that is used;
and it would seem * * * that it must not be
plainly and obviously defective, so much so that no man
of ordinary capacity could be misled by it." *Tate* v.
*Southard* (1824), 10 N. C. (3 Hawks) 119, 14 Am. Dec.
578.

"Color of title * * * requires a party to have
some written document of title, purporting to pass the
land, and one not so obviously defective that it would
not have misled a man of ordinary capacity." *Elling-*
*ton* v. *Ellington* (1889), 103 N. C. 54.

Color of title is anything in writing purporting to
convey title to land and defining the extent of the claim,
it being immaterial how defective or imperfect the writ-
ing may be, so that it is a sign or semblance of title.
*Veal* v. *Robinson* (1883), 70 Ga. 809.

Any instrument having a grantor and a grantee, and
containing a description of the lands intended to be con-
veyed and apt words for their conveyance, gives color
of title to the lands described.   Such an instrument pur-
ports to be a conveyance of the title; it passes only color
or the semblance of a title.   It makes no difference
whether the instrument fails to pass an absolute title
because the grantor had none to convey, or had no
authority in law or in fact to convey one, or whether
the want of authority appears on the face of the in-
strument or *aliunde.*   The instrument fails to pass an
absolute title, for the reason that the grantor was not

possessed of some one or more of these requisites, and therefore it gives the semblance or color only of what its effect would be if they were not wanting. *Brooks* v. *Bruyn* (1864), 35 Ill. 394.

The Supreme Court of our own state long ago made the clear statement that "instruments which do not purport to convey title cannot be the foundation of an adverse possession." *Allen* v. *Smith* (1843), 6 Blackf. 527.

The Supreme Court of the United States has said: "The courts have concurred, it is believed, without an exception, in defining color of title to be that which in appearance is title, but which in reality is not title." *Wright* v. *Mattison* (1855), 18 How. (U. S.) 56, 15 L. Ed. 283.

Exactly when and where the idea denoted by the phrase "color of title" was first utilized in the substantive law of real property, we are unable to say. As early as 1824 Judge Henderson, a member of a highly respectable court, in discussing adverse possession, said:

"Colour of title, as applicable to the present subject, is evidently the production of our own country. I will not, therefore, go abroad for an explanation: the name, I presume, is taken from what is called giving colour in pleading, which is never used in this State, and not often, I believe, in England. * * * Giving colour in pleading, is giving to your adversary a title which is defective, but not so obviously so, that it would be apparent to one not skilled in the law—it must be such as would perplex a layman; it, therefore, draws the consideration of the question from the Jury (the lay gents) to the Court, which is the object of the pleading." *Tate* v. *Southard, supra.*

In the course of his discussion of the subject of pleading, Blackstone says:

"But if the defendant, in an assize or action of tres-

pass, be desirous to refer the validity of his title to the court rather than the jury he may state his title specificially, and at the same time *give color* to the plaintiff, or suppose him to have an appearance or color of title, bad indeed in point of law, but of which the jury are not competent judges." 3 Blackstone Comm., Ch. 10.

It is certain, however, that the occasion for the invention and use of the device known as color of title in the substantive law arose out of the conditions which prevailed in our country in pioneer days. Wild land was then plentiful, and of little value except to the actual settler. The people then were careless about their conveyances and equitable titles abounded. When a settler acquired a "quarter" or an "eighty" he erected a log cabin and moved onto his land with a firm intention to improve it and make it his permanent home. Usually he had no capital for the purpose of development other than his strong arms and a will to work. There was no economic inducement for him to enclose the entire tract by fences; but on the contrary, stern economic conditions actually prevented it. The task of subduing the wild land and subjecting it to his actual occupancy was a slow process and had to be accomplished acre by acre. So therefore, it often happened that an honest settler who had procured a paper title to a definite tract, had lived upon it a sufficient number of years to fulfill the statute of limitations, and had made improvements which enhanced the value of the whole, but had subjected to his actual occupancy only a part, was finally confronted with the fact that his title papers were worthless. In such cases the courts— be it said to their credit—seized upon the device of "color of title" to extend by construction the settler's actual occupancy to the boundaries, and to make his possession in contemplation of law coextensive with the tract described in his paper title. Thus the courts con-

trived to secure to him that which in good faith he sought to acquire and for which he had planned and toiled.

A study of the cases, as well as various legislative enactments on this subject, leads irresistibly to the conclusion that color of title is a legal fiction utilized by judges and legislators as a device whereby to secure to the settler that which strongly appealed to their inherent sense of fairness as being the settler's due, in view of the prevailing conditions in a new country. From the decisions it is clear that, for the purpose of protecting settlers who were actually engaged in developing the country and establishing homes, the courts availed themselves of the fiction as a foundation on which to rest the doctrine that where color of title exists actual possession of a part only shall be regarded in law as actual possession of the whole. Rightly understood, color of title serves no other purpose—unless otherwise provided by statute. See *Jeffersonville, etc.* v. *Oyler* (1882), 82 Ind. 394, 404; *Noyes* v. *Dyer* (1845), 25 Me. 468; *Stull* v. *Rich Patch Iron Co.* (1895), 92 Va. 253, 23 S. E. 293; *Hecock* v. *Van Dusen* (1890), 80 Mich. 359, 45 N. W. 343; *Fugate* v. *Pierce* (1872), 49 Mo. 441; *Miesen* v. *Canfield* (1896), 64 Minn. 513, 67 N. W. 632; *Swift* v. *Mulkey* (1889), 17 Ore. 532, 21 Pac. 871; *Wright* v. *Mattison, supra; Carter* v. *Chevalier* (1895), 108 Ala. 563, 19 South. 798; *Tate* v. *Southard, supra; Bynum* v. *Thompson* (1843), 25 N. C. 578; *Ellington* v. *Ellington, supra; Reedy* v. *Camfield* (1896), 159 Ill. 254, 42 N. E. 833; *Jackson* v. *Woodruff* (1823), 1 Cow. (N. Y.) 276, 13 Am. Dec. 525; *Bellows* v. *Jewell* (1880), 60 N. H. 420; *Ohio & Miss. Ry. Co.* v. *Barker* (1888), 125 Ill. 303, 17 N. E. 797; *Beverley* v. *Burke* (1850), 9 Ga. 440, 54 Am. Dec. 351; *Crowder* v. *Doe* (1909), 162 Ala. 151, 50 South. 230, 136 Am. St. 17; *Barrett* v. *Brewer* (1910), 153 N. C. 547, 69 S. E.

614, 42 L. R. A. (N. S.) 403; *Power* v. *Kitching* (1901), 10 N. D. 254, 86 N. W. 737, 88 Am. St. 691.

It has been said that a void or worthless deed has always been received for another purpose, viz.: as evidence that the occupant claims for himself; that his occupancy is under a claim of right; in other words, that his possession is *adverse*.  *Pillow* v. *Roberts* (1851), 13 How. (U. S.) 472, 14 L. Ed. 228.  That is all very true.  But the fact that the possession has been *adverse* may be shown also by spoken words—as in cases of parol gifts or attempted parol conveyances; by a continuing course of conduct, and by any relevant facts.  Therefore when a void deed is received in evidence solely for this purpose, its admissibility does not rest on the ground that it constitutes color of title, but rather on the ground that it is a circumstance tending to show that the possession has not been that of a mere trespasser, or that of a lessee, or that it has been in any manner subservient to the owner of the legal title, but at all times has been under a claim of ownership or claim of title.  It is quite unnecessary, however, to inject the idea of color of title where the evidence is introduced for the sole purpose of showing that the possession has been adverse; and indeed it is not legitimate to do so.  Right here is the source of the whole trouble.  Some judges have been so careless as to use the phrase "color of title" when they really meant "claim of title."  This confusion of words has led, naturally, to confusion of ideas.  1 R. C. L. 705 *et seq.; Crowder* v. *Doe, supra; Barrett* v. *Brewer, supra; Hamilton* v. *Wright* (1870), 30 Iowa 480.

As a matter of general law, color of title must be a document purporting to convey title to real estate, but which for some reason does not do it.  It must desig-

1. nate a grantor and a grantee, must contain apt words of conveyance, and a description of the land intended to be conveyed. An examination of a large number of cases has wrought the convection that no court ever has held otherwise where the question was legitimately decided, and that all statements to the contrary, when scrutinized, will be found to be either *dicta* or instances of carelessness of expression.

Now, our statute must not be overlooked. Sections 700 and 701 of the Civil Code provide:

4. "The purchaser in good faith at any judicial or tax sale, made by the proper person or officer, has color of title within the meaning of this act, whether such person or officer had sufficient authority to sell or not, unless the want of authority was known to the purchaser at the time of the sale; and the rights of the purchaser shall pass to his assignees or representatives." §1127 Burns 1914, §1080 R. S. 1881.

"Any occupant of land who can show a connected title in law or equity, derived from the records of any public office, or who holds the same by purchase or descent from any person claiming title derived as aforesaid or by deed duly recorded, has color of title, within the meaning of this act." §1128 Burns 1914, §1081 R. S. 1881.

There can be no doubt of the applicability of these statutory provisions to the case at bar. By enumerating and specifying what shall constitute color of title, all else is excluded. The public welfare is involved and the courts will neither add to, nor subtract from, the legislative definition.

The appellee is an intelligent woman—keen and shrewd. She knew that the deed which she says the

5. mysterious Mr. Bingham left temporarily with her, did not purport to convey the land to her. The doctrine of color of title is available only in

cases where the instrument purporting to be a convey-
ance is accepted in good faith and in the honest belief
that it vests the title in the claimant. *Wright* v.
*Tichenor* (1885), 104 Ind. 185, 3 N. E. 853; *Wilson* v.
*Atkinson* (1888), 77 Cal. 485, 20 Pac. 66, 11 Am. St.
299.

From the foregoing discussion it is clear that Bing-
ham's oral statement to the effect that "you may .have
this land" does not constitute color of title.

4. Furthermore, it is elementary that color is a
property depending on the relations of light to
the eye; and to say that spoken words may constitute
color of title would be to carry the metaphor to an
absurdity. Color of title may be used as a shield to
protect honest claimants, but it must not be permitted
to become an instrument of stealth and deadliness for
the perpetration of fraud. .The appellee did not have
color of title.

We have now to consider certain cases which seem to
conflict with our holding on the question of color of
title.

The opinion in *Bell* v. *Longworth* (1855), 6 Ind. 273,
is peculiar. Harrison and Beaman purchased a quar-
ter section from the United States. They paid one-
fourth of the purchase money and received the usual
certificate, which they subsequently assigned to Paxon
and Pearson. In 1821 Paxon and Pearson assigned
the certificate to Longworth, and this assignment was
acknowledged before the register of the land office.
Longworth took possession of the land, or at least a
part of it, in 1822. In 1825 Longworth paid to the
United States the remaining three-fourths of the pur-
chase money; and the patent deed was issued in the
names of Harrison and Beaman, because the assign-
ments of the certificate had not been recorded in the
land office, but was delivered to Longworth. Long-

worth conveyed an undivided one-half to Miles. In 1851 some of the heirs of Paxon executed a conveyance to Bell and Kiger, who, in 1852, entered upon a portion of the land and attempted to exercise dominion thereover. On these facts it is clear that when Longworth paid the balance of the purchase money he became the equitable owner of the land. In a proper proceeding a state court would have decreed a trust in his favor and quieted his title; and a Federal court would have enforced his rights by compelling a transfer to him of the legal title, or by canceling the patent deed, or by enjoining the grantees named therein from asserting any right thereunder. *Redfield* v. *Parks* (1889), 132 U. S. 239, 10 Sup. Ct. 83, 33 L. Ed. 327. The court correctly held by plain implication that the certificate of entry assigned to Longworth constituted in his hands color of title; and the court might well have rested there. See *Jeffersonville, etc.* v. *Oyler, supra*. The question whether spoken words or a gift by parol may constitute color of title, was in no manner involved. What the court said on that subject is *dictum*. Moreover, the case of *Sumner* v. *Stevens* (1843), 6 Met. (47 Mass.) 337, cited by the court, does not sustain the proposition stated in the *dictum*.

In *Vancleave* v. *Milliken* (1859), 13 Ind. 105, the question of what constitutes color of title was not involved; yet the court in its opinion strayed beyond the limits and repeated the following quotation from the Longworth case: "But where a party is in possession under and pursuant to a state of facts which, of themselves, show the character and extent of his entry and claim, the case is entirely different; and such facts, whatever they may be in a given case, perform sufficiently the office of color of title."

An earnest effort to discover what legal principle Judge Perkins had in mind when he wrote the words

above quoted has resulted in failure. It would be idle to speculate on this matter, for the plain truth is that the statement is more than indefinite; it is unintelligible.

In *Wilson* v. *Campbell* (1889), 119 Ind. 286, 21 N. E. 893, the question of color of title was neither involved nor mentioned.

In *Hitt* v. *Carr* (1915), 62 Ind. App. 80, 109 N. E. 456, it is apparent that the judge who wrote that opinion was misled, as to what may constitute color of title, by the Indiana cases therein cited on that subject; and the Indiana statute which defines color of title is not mentioned in the opinion. In so far as the Hitt case holds that spoken words may constitute color of title in this jurisdiction it is erroneous and must not be regarded as authority, and to that extent is overruled.

Did the appellee have such actual possession as will justify a court in giving her the land as against the holders of the record title?

6. In all civilized countries the subject of real estate titles is regarded as of sufficient public importance to justify state regulation. The legislature of our state long ago adopted regulatory measures on this subject, declared that all conveyances of land shall be by deed in writing, and prescribed a plan by which the title to every tract of land may be made a matter of public record. §3936 *et seq.* Burns 1914, §2915 *et seq.* R. S. 1881. The legislature has provided also the manner in which lands may be devised and wills recorded. §3112 *et seq.* Burns 1914, §2556 *et seq.* R. S. 1881. A title evidenced by conveyances, wills, decrees of court, and proof of heirship, is commonly called a *legal* title—in contradistinction to an *equitable* title. It is the policy of the law to protect land titles created in accordance with the plan prescribed by the legislature. In this connection it should be observed that a prominent feature of the stat-

ute of frauds and of the statute of trusts is that they serve effectively to safeguard legal titles. §§7462 et seq., 4012 et seq. Burns 1914, §§4904 et seq., 2969 et seq. R. S. 1881.

A record title is the highest evidence of ownership, and is not easily defeated. A record title may be overcome by facts sufficient to warrant a court in establishing an implied trust; but before a court will raise up an implied trust, in opposition to the legal title, the proof of all the essential facts must be clear and unequivocal. Blair v. Bass (1838), 4 Blackf. 539; Baker v. Leathers (1852), 3 Ind. 558; Fausler v. Jones (1855), 7 Ind. 277; Turner v. First National Bank (1881), 78 Ind. 19; Westerfield v. Kimmer (1882), 82 Ind. 365.

A record title may be defeated by adverse possession, but mere possession is the lowest evidence of ownership. All the authorities agree that before the owner of the legal title can be deprived of his land by another's possession, through the operation of the statute of limitations, the possession must have been actual, visible, notorious, exclusive, under claim of ownership, and hostile to the owner of the legal title and to the world at large (excepting only the government), and continuous for the full period prescribed by the statute. While the rule is not always stated in exactly the same words in all the thousands of cases dealing with this subject, nevertheless the rule is so thoroughly settled that there is no justification for the existence of a doubt as to what elements are essential to raise up a title by adverse possession. Worthley v. Burbanks (1897), 146 Ind. 534, 45 N. E. 779; Rennert v. Shirk (1904), 163 Ind. 542, 72 N. E. 546; May v. Dobbins (1906), 166 Ind. 331, 77 N. E. 353; Vandalia R. Co. v. Wheeler (1914), 181 Ind. 424, 103 N. E. 1069;

*Craven* v. *Craven* (1913), 181 Ind. 553, 103 N. E. 333, 105 N. E. 41; *Tolley* v. *Thomas* (1910), 46 Ind. App. 559, 93 N. E. 181; *McBeth* v. *Wetnight* (1914), 57 Ind. App. 47, 106 N. E. 407; *Benedict* v. *Bushnell* (1917), 65 Ind. App. 365, 117 N. E. 267. 1 R. C. L. 685, and authorities there cited; 2 C. J. 50, and authorities there cited.

It will be profitable now to consider briefly the elements of the rule.

(1) The possession must be actual. In the very nature of things there can be no constructive possession except by intendment of law, and the only constructive possession known to the law is that which inheres in the legal title and with which the owner of that title is always endowed. *Morrison* v. *Kelly* (1859), 22 Ill. 610, 74 Am. Dec. 169; *Cook* v. *Clinton* (1887), 64 Mich. 209, 31 N. W. 317, 8 Am. St. 816; *Smeberg* v. *Cunningham* (1893), 96 Mich. 378, 56 N. W. 73, 35 Am. St. 613; *Ables* v. *Webb* (1905), 186 Mo. 233, 85 S. W. 383, 105 Am. St. 610; *Colvin* v. *Republican, etc., Land Ass'n.* (1888), 23 Neb. 75, 36 N. W. 361, 8 Am. St. 114; *Bailey* v. *Carleton* (1841), 12 N. H. 9, 37 Am. Dec. 190; *Jackson* v. *Woodruff, supra; Faull* v. *Cooke* (1890), 19 Ore. 455, 26 Pac. 662, 20 Am. St. 836; *Willamette Real Estate Co.* v. *Hendrix* (1895), 28 Ore. 485, 42 Pac. 514, 52 Am. St. 800; *Irvine* v. *McRee* (1845), 5 Humph. (Tenn.) 554, 42 Am. Dec. 468; *Evans* v. *Templeton* (1887), 69 Tex. 375, 6 S. W. 843, 5 Am. St. 71; *Overton* v. *Davisson* (1844), 1 Grat. (Va.) 211, 42 Am. Dec. 544; *Arnold* v. *Stevens* (1839), 24 Pick. (Mass.) 106, 35 Am. Dec. 305; *Carson* v. *Burnett* (1836), 18 N. C. 546, 30 Am. Dec. 143; 1 R. C. L. 692; 2 C. J. 51 *et seq.* and authorities there cited.

(2) The possession must be visible. The basic theory is that the owner of land who, having notice of the fact

that it is occupied by another who is claiming dominion over it, nevertheless stands by, during the entire statutory period, and makes no effort to eject the claimant or otherwise protect his title, ought not to be permitted, for reasons of public policy, thereafter to maintain an action for that purpose. However, in order that the possession of the occupying claimant may constitute notice in law, it must be visible and open to the common observer so that the owner or his agent on visiting the premises might readily see that the owner's rights are being invaded. In accordance with the general rule applicable to the subject of constructive notice, before possession can operate as such notice, it must be clear and unequivocal. *Holcroft* v. *Hunter* (1832), 3 Blackf. 147; *Towle* v. *Quante* (1910), 246 Ill. 568, 92 N. E. 967; *Tinker* v. *Bessel* (1912), 213 Mass. 74, 99 N. E. 946; *Bynum* v. *Hewlett* (1902), 137 Ala. 333, 34 South. 391; *Jasperson* v. *Scharnikow* (1907), 150 Fed. 571, 80 C. C. A. 373, 15 L. R. A. (N. S.) 1178.

(3) The possession must be notorious. It must be so conspicuous that it is generally known and talked of by the public—at least by the people in the vicinity of the premises. It must be manifest to the community. In the course of twenty years a visible occupancy naturally ought to become notorious. It ought to be so well known and commonly understood that the people residing in the neighborhood could testify with substantial unanimity concerning its existence. Where the persons who have passed frequently over and along the premises have been unable to see any evidence of occupancy, evidently the possession has not been of the character required by the rule. The purpose of this requirement is to support the principle that a legal title will not be extinguished on flimsy and uncertain evidence. Hence, where there has been no actual notice, the possession must have been so notori-

ous as to warrant the inference that the owner ought to have known that a stranger was asserting dominion over his land. Insidious, desultory, and fugitive acts will not serve that purpose. To have that effect the possession should be clear and satisfactory, not doubtful and equivocal. *Courtney* v. *Ashcraft* (1907), 31 Ky. Law 1324, 105 S. W. 106; *Ewing* v. *Alcorn* (1861), 40 Pa. St. 492; *Washabaugh* v. *Entriken* (1859), 34 Pa. St. 74, *Id.* 36 Pa. 513; *Adams* v. *Robinson* (1847), 6 Pa. St. 271; *Wilson* v. *Blake* (1880), 53 Vt. 305; *Cook* v. *Clinton, supra; Watrous* v. *Morrison* (1894), 33 Fla. 261, 14 So. 805, 39 Am. St. 139; *Brown* v. *Cockerell* (1858), 33 Ala. 38; *Kerr* v. *Hitt* (1874), 75 Ill. 51; *De Frieze* v. *Quint* (1892), 94 Cal. 653, 30 Pac. 1, 28 Am. St. 151; *Wren* v. *Parker* (1889), 57 Conn. 529, 18 Atl. 790, 6 L. R. A. 80, 14 Am. St. 127; *Evans* v. *Templeton, supra; Smeberg* v. *Cunningham, supra.* See 1 R. C. L. 700, and authorities there cited; 2 C. J. 75, and authorities there cited.

(4) The possession must be exclusive. It is self evident that two or more persons cannot hold one tract of land adversely to each other at the same time.

13. It is essential that the possession of one who claims adversely must be of such an exclusive character that it will operate as an ouster of the owner of the legal title; because, in the absence of ouster the legal title draws to itself the constructive possession of the land. A possession which does not amount to an ouster or disseisin is not sufficient. *Maple* v. *Stevenson* (1890), 122 Ind. 368, 23 N. E. 854; *Wiggins* v. *Holley* (1858), 11 Ind. 2; *Stiff* v. *Cobb* (1899), 126 Ala. 381, 28 So. 402, 85 Am. St. 38; *Faull* v. *Cooke, supra; Doyle* v. *Wade* (1887), 23 Fla. 90, 11 Am. St. 334; *Wilson* v. *Braden* (1904), 56 W. Va. 372, 49 S. E. 409, 107 Am. St. 927. See 1 R. C. L. 701 and 702 and cases there cited. The possession must be exclusive also as against

persons other than the owner of the legal title; and where the claimant occupies the land in common with third persons, or with the public generally, the possession is not such exclusive possession as will constitute the basis of a title.

(5) The possession must be under claim of ownership. *Maple* v. *Stevenson, supra.* Of course no one would contend that possession under a lease, no matter how long continued, can ever result in a transfer of the title to the tenant; for the possession of a tenant is in law the possession of the landlord. The possession of a mere trespasser or squatter never can eventuate in title, for his possession is deemed in law to be in subservience to the owner. *Buckley* v. *Taggart* (1878), 62 Ind. 236. See *Colvin* v. *Republican, etc., Land Ass'n., supra; Smeberg* v. *Cunningham, supra; Jasperson* v. *Scharnikow, supra.* Where actual occupancy is taken in subserviency to the holder of the legal title, manifestly the character of that occupancy ought not to be changed to an adverse occupancy except by the mutual agreement of the parties. To hold otherwise would be to jeopardize legal titles by conferring upon an actual occupant the power to change arbitrarily the initial character of his occupancy by his will alone. By virtue of the statute of frauds, such a transformation can be accomplished only by an instrument in writing signed by the holder of the legal title. This principle is enforced with great strictness. *King* v. *Hartley* (1919), 71 Ind. App. 1, 123 N. E. 728. See also 1 R. C. L. 705 and authorities there cited; 2 C. J. 125 and authorities there cited.

(6) The possession must be hostile. The land must be held in direct opposition to the holder of the legal title and all others, excepting only the government. This is the very essence of ownership; for one cannot say confidently, "this land is my

own" unless he have such evidence of ownership as will enable the courts to protect him in the exercise of dominion thereof as against all who may assail him. The object of this provision is to make the occupancy itself sufficient evidence of the adverse intent of the party holding it, in the absence of other evidence establishing its true nature. *Worcester* v. *Lord* (1868), 56 Me. 265, 96 Am. Dec. 456; *Grube* v. *Wells* (1871), 34 Iowa 148. See 2 C. J. 122 and authorities there cited; 1 R. C. L. 703 and authorities there cited.

(7) The possession must be continuous for the full statutory period. An intermittent occupancy will not satisfy the requirements of the law; for the moment the land becomes vacant the law restores the possession to the holder of the legal title. *Winslow* v. *Winslow* (1875), 52 Ind. 8; *Wilson* v. *Braden, supra.* See 1 R. C. L. 716 and authorities there cited; 2 C. J. 80 and authorities there cited.

On critical analysis it may be said that some of the requirements of the rule blend or overlap, and that the number might be reduced. However, if the rule be not stated with scientific precision, nevertheless its purpose cannot be mistaken. That purpose is to protect legal titles and to prevent one from stealing another's land on the pretense of adverse possession.

The general rule is that a verdict for the plaintiff will not be permitted to stand unless there is evidence, competent and substantial, tending fairly to prove each and every element essential to the cause of action. But in the class of cases to which the case at bar belongs the rule is more exacting. In such cases the imperative rule is that the facts relied on as constituting adverse possession must be strictly proved. All presumptions are in favor of the holder of the legal title, and the burden of overcoming them is upon him who assails the legal title.

In order to exclude the presumptions, the proof must be strict, clear, positive, and unequivocal. A title by adverse possession may not be established on inference or implication.

It has been justly said that: "A party claiming title by adverse possession always claims in derogation of the right of the real owner. He admits that the legal title is in another. He rests his claim, not upon a title in himself as the true owner, but upon holding adversely to the true owner for the period prescribed by the statute of limitations. Claiming a benefit from his own wrong, his acts are to be construed strictly." *Doe* v. *Brown* (1853), 4 Ind. 143; *Grosholz* v. *Newman* (1874), 21 Wall. (U. S.) 481, 22 L. Ed. 471; *Collins* v. *Riley* (1881), 104 U. S. 328, 26 L. Ed. 752; *Grube* v. *Wells, supra; Kirby* v. *Kirby* (1908), 236 Ill. 255, 86 N. E. 259; *Lambert* v. *Hemler* (1910), 244 Ill. 254, 91 N. E. 435; *Rich* v. *Naffziger* (1911), 248 Ill. 455, 94 N. E. 1; *White* v. *Harris* (1904), 206 Ill. 584, 69 N. E. 519; *Zirngibl* v. *Calumet Dock Co.* (1895), 157 Ill. 430, 42 N. E. 431; *Rowland* v. *Updike* (1859), 28 N. J. Law 101. See 2 C. J. 262 *et seq.* and authorities there cited.

Assuming only for the sake of applying the law that the Bingham story is not purely mythical and that the appellee had possession of lot 2, Was her initial possession taken, and thereafter maintained, in good faith and under a substantial claim of ownership?

She very well understood that the proposed gift was not completed. Her understanding was that Bingham was to complete the transaction by sending her a deed. He wrote her requesting the return of his deed and she complied with that request. Afterward she wrote him, but never received a deed from him and never even heard from him. On these facts no reasonably prudent person would rely. They do not constitute a sufficient foundation on which to rest a confident belief that she

owned the land. Her failure to pay the taxes and her utter indifference with respect thereto stamp her claim of ownership with the insignia of insincerity. She was careful to pay the taxes on her property in the town of Miller, and nothing short of an overpowering reason could have induced her to neglect so completely even to inquire concerning the taxes on this land. That reason can be found only in the inference that she never believed that she owned it. Although Bingham talked to her about lot 1, she never made any inquiry concerning the plat or subdivisions of the section, and never heard of the existence of lot 2 until her action was commenced. She stood by for at least thirty-five years and saw other people occupying the land which she says Bingham gave her; she knew that buildings were being erected thereon; she knew that some of the buildings were sold and moved away; and yet she never protested. She made no effort whatever to create the relation of landlord and tenant between herself and the other occupants until after the commencement of this action. That she never intended to claim ownership of the land until after it became highly valuable; and that she never had, and does not now have, an honest belief that she is the owner thereof— are perfectly legitimate conclusions to be drawn from all the evidence. She cannot be permitted to acquire title by adverse possession on evidence which fails to exclude these inferences. Her intention is an essential element. *Worcester* v. *Lord, supra; Stiff* v. *Cobb, supra.*

The evidence with respect to those specific acts which counsel for the appellee claim to have been done on lot 2, is obscure, and it cannot be determined with certainty exactly where they were done. Assuming, for the sake of applying the principle involved, that counsel are correct in that contention,

Are those acts sufficient to sustain a claim of adverse possession? The river forms the south boundary of lot 2; and taking ice from the river, even if taken from a place where the river borders on that lot, would not justify the inference that appellee was claiming ownership of the lot. Taking ice in the winter, tarring nets in the spring, cutting evergreens at Christmas time, (the supply of evergreens did not last long), gathering sassafras in the spring, picking sand-cherries and wild grapes in-season, selling a small quantity of timber, hunting and trapping, were intermittent, fugitive, trivial and mere predatory acts, doubtful and equivocal in their significance. Moreover, the public generally committed like acts with equal freedom.

It must be borne in mind that none of the acts done on lot 2 were constructive. All of them were destructive. No effort was made to conserve the game. The appellee was not engaged in breeding wild animals for gain. Her purpose was merely to utilize them. No attempt was made to maintain or increase the supply of wild grapes, sand-cherries, sassafras, or Christmas trees. She merely joined the public in helping herself to what nature presented. She never changed the face or course of nature a particle. Nothing whatever was done to acquire a foothold on that lot or to impress upon it the slightest evidence of civilization.

It has been said that, "if the acts of ownership are such as are usually practiced by owners of similar lands in that vicinity," they will constitute sufficient evidence of possession. *Hitt* v. *Carr, supra.* If that principle were applied to the case at bar, it would not avail the appellee; for the owners of similar land in the same vicinity made no use of it whatever. Indeed, it was not appropriated to any of the uses of civilization and was interesting only to hunters and students of nature who cared to observe the workings of certain geological

forces.   But the statement above quoted is so indefinite that it is of no practical value.   Each claim of title by adverse possession must stand or fall by its own facts. *Adams* v. *Clapp* (1895), 87 Me. 316, 32 Atl. 911.   In the case at bar the law imperatively requires that the possession shall follow the legal title.   It is clear that the owners of the legal title have been holding the land as an investment only, and at last it has become valuable merely as advantageous ground space.

All the time during which the appellee claims to have had possession, the land was of the wildest character, consisting of barren and shifting sand, not susceptible of agriculture, grazing, mining, horticulture, or any other ordinarily useful purpose; and was not susceptible of permanent improvement within the realm of reason and prudence.   It is unwise, however, to emphasize the idea denoted by the word "use"; for the character of the *use* is not of itself an ultimate factor.   It is immaterial whether the use is provident or improvident, profitable or unprofitable, efficient or inefficient, or whether it is like the use made of similar lands in the same vicinity by the owners. The ultimate test is whether the possession was of such a character as would constitute notice to the owner, had he visited the land at any time during the statutory period, that an enemy was flying a hostile flag over his property.   In order to acquire title by adverse possession to wild land, there must be actual occupation of it of such unequivocal character as will unmistakably indicate to the owner, visiting the premises at any time during the statutory period, that someone has appropriated it to his own use and is asserting exclusive ownership thereof, instead of suggesting only occasional trespasses.   This rule is applied with great strictness. *Adams* v. *Clapp, supra; Overton* v. *Davisson, supra; Morrison* v. *Kelly, supra; Wheeler* v. *Winn*

(1866), 53 Pa. 122, 91 Am. Dec. 186; *Linen* v. *Maxwell* (1892), 67 N. H. 370, 40 Atl. 184; *White* v. *McNabb* (1910), 140 Ky. 828, 131 S. W. 1021; *Bliss* v. *Johnson* (1883), 94 N. Y. 235; *Archibald* v. *New York Cent., etc., R. Co.* (1899), 157 N. Y. 574, 52 N. E. 567; *Ruffin* v. *Overby* (1890), 105 N. C. 78, 11 S. E. 251; *Bump* v. *Butler County* (1899), 93 Fed. 290; *Cohn* v. *Smith* (1909), 94 Miss. 517, 49 South. 611; *Chicago, etc., R. Co.* v. *Galt* (1890), 133 Ill. 657, 23 N. E. 425, 24 N. E. 674; *Aiken* v. *Ela* (1882), 62 N. H. 400; *Cornelius* v. *Giberson* (1855), 25 N. J. Law 1; *Young* v. *Herdic* (1867), 55 Pa. 172; *Langhorst* v. *Rogers* (1908), 88 Ark. 318, 114 S. W. 915; *Petticrew* v. *Greenshields* (1911), 61 Wash. 614, 112 Pac. 749; *Frederick* v. *Goodbee* (1908), 120 La. 783, 45 South. 606; *Dowdell* v. *Orphans Home* (1905), 114 La. 49, 38 South. 16; *Hillman Land, etc., Co.* v. *Marshall* (1909), (Ky.) 119 S. W. 180; see also 2 C. J. 54 *et seq.* and authorities there cited; 1 R. C. L. 695 *et seq.* and authorities there cited. It cannot be said that any of the acts which the appellee claims to have done on lot 2 indicate an intention to appropriate the land. The appellee seeks to escape the effect of the foregoing rule on the basis that the land was not susceptible of any other kind of occupancy. That being true, it follows logically that land which is so bad that it is not susceptible of the sort of occupancy required by the rule, cannot be the subject of adverse possession.

It is important to note that the appellee never resided on this land. A, B, C, and D mark the places on the plat where she claims to have resided consecutively from 1874 to 1896. It is also important to note that the sand has been steadily filling up the margin of the lake and the water has been receding. The people who lived along the shore entertained the idea that the ground thus formed constituted a sort of no-man's land which

they could occupy and hold at pleasure and without permission from any one; and it is not likely that in this respect the appellee differed from the rest.

The charge to the jury consists of fifty-seven paragraphs, seven of which relate to mere formal matters, and all the others relate to the subject of adverse possession. Clearly all of the latter group are radically wrong. The errors in the instructions alone would compel a reversal. It is unnecessary to discuss the instructions. Counsel as well as the trial court may readily see wherein the instructions conflict with the law of the case as stated in this opinion.

When the evidence most favorable to the appellee is taken alone, all else having been excluded, it falls far short of fulfilling the requirement of the law and fails signally to make out a case of adverse possession. It is apparent that if the trial court had not misapprehended the law of the case, and had instructed the jury as it was his duty to do, a verdict for the appellee could not have been returned. Therefore, the verdict is contrary to law and cannot be permitted to stand.

The judgment is reversed, and the trial court is directed to grant a new trial.

. McMahan, J., not participating.

### ON PETITION FOR REHEARING.

DAUSMAN, P. J.—In her petition for rehearing the appellee contends that the statutory definitions of color of title are not applicable to the case at bar. The 22. argument is that those sections of the statute which define color of title were originally part of an act for the relief of occupying claimants by enabling them to recover for taxes paid, and for valuable improvements made on the land in controversy, where they were unable to hold the land as against the true

owner—thereby softening the rigors of the common law. From that argument appellee's counsel conclude that the statutory definitions are limited as to their application to actions in ejectment. We find no fault with the statements made in the argument, but we cannot concur in the conclusion. In the Revision of 1881 those sections were taken from the earlier act and were inserted in, and became a part of, the act entitled "An Act concerning proceedings in civil cases," which later act is commonly known as the Revised Civil Code. This later act consists of 867 sections and covers a wide range of subjects, including ejectment and quiet title. Following the subjects of ejectment and quiet title, come the definitions. In this connection the statute provides that after the question of title has been litigated and adjudicated in the "proper" or "main" action, an occupying claimant who has been defeated in the main action, may file his complaint (thereby instituting a kind of secondary action) to recover the value of the improvements made in good faith under color of title. §§1121, 1124 Burns 1914, §§1074, 1077 R. S. 1881.

We are firmly of the opinion that it was the intention of the legislature that said statutory definitions should be applicable in every case wherein the question of title is in issue, regardless of the form of the action. We conceive that it is not the policy of the legislature and the courts to apply one rule in favor of honest claimants who, mistakenly but in good faith, have taken possession of land not their own, paid the taxes and made valuable and lasting improvements thereon, and a different and more liberal rule in favor of those who can offer no evidence of possession other than acts of vandalism. If spoken words may not constitute color of title in favor of the former class, then, for the greater reason, spoken words should not constitute color of title in

favor of the latter class. The contention of appellee's counsel does not appeal to our sense of fairness.

Other reasons for a rehearing are assigned, but after due consideration we are of the opinion that further discussion of other points embraced in the original opinion would be unprofitable.

The petition for a rehearing is denied.